**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 JAN -5  PM 3: 29

DEPUTY CLERK _____

| | |
|---|---|
| UNITED STATES OF AMERICA | NO. 3:15-cr-00496-L |
| v. | |
| USPLABS, LLC, A TEXAS CORPORATION; JACOBO GEISSLER (a.k.a. JACOB GEISSLER); JONATHAN DOYLE; MATTHEW HEBERT; KENNETH MILES; S. K. LABORATORIES, INC., A CALIFORNIA CORPORATION; SITESH PATEL; and CYRIL WILLSON (a.k.a. ERIK WHITE). | |

## FIRST SUPERSEDING INDICTMENT

The Grand Jury Charges:

At all times material to the indictment:

## The Defendants

1.     **USPlabs, LLC** (hereinafter, "**USP Labs**") was incorporated under the laws of the

State of Texas and sold dietary supplements.

2.     **Jacobo Geissler** (a.k.a. Jacob Geissler) was the co-founder, co-owner, and CEO

of **USP Labs**.  **Jacobo Geissler** formulated products and oversaw all aspects of **USP**

**Labs**' operation.

3.     **Jonathan Doyle** was the co-founder, co-owner, and president of **USP Labs**.

Along with **Jacobo Geissler**, **Jonathan Doyle** oversaw all aspects of **USP Labs**'

operations, with a focus on marketing.

4.      **Matthew Hebert** was a co-owner of **USP Labs** with primarily responsibilities over product packaging design.

5.      **S. K. Laboratories, Inc.** (hereinafter, "**S. K. Laboratories**") was incorporated under the laws of the State of California and was a Southern California-based dietary supplement manufacturing firm.  **S. K. Laboratories** was responsible for manufacturing many of **USP Labs**' products.

6.      **Sitesh Patel** was the vice president of **S. K. Laboratories**.  He interfaced with **USP Labs** and coordinated and oversaw the manufacture of some of **USP Labs**' products.

7.      **Cyril Willson** (a.k.a. Erik White) was a former co-owner of **USP Labs**.  He was responsible for coordinating much of **USP Labs**' scientific research and for identifying new substances as prospective ingredients for **USP Labs**' products.  When dealing with the public on **USP Labs** matters, **Cyril Willson** used the fake name "Erik White."

### The Regulatory Agency

8.      The United States Food and Drug Administration ("FDA"), was the federal agency charged with the responsibility of protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301-399f ("FDCA").  One of the purposes of the FDCA was to ensure that foods entering interstate commerce are safe to eat and bear labeling containing true and accurate information.

9.      The FDCA defined "food" as "articles used for food or drink for man or other animals" and "articles used for components of any such article."  21 U.S.C. § 321(f)(1) and (3).  The FDCA defined a dietary supplement, in part, as "a product (other than

tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients. . . (A) a vitamin; (B) a mineral; (C) an herb or other botanical…." 21 U.S.C. § 321(ff)(1).  A dietary supplement was deemed to be a food within the meaning of the FDCA.  21 U.S.C. § 321(ff).  As a component of dietary supplements, dietary ingredients were also deemed to be "food" under the FDCA.  21 U.S.C. § 321(f)(3).

10.    Food was misbranded under the FDCA if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1).

11.    A dietary supplement was adulterated under the FDCA if it was a "dietary supplement . . . that present[ed] a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling." 21 U.S.C. § 342(f)(1)(A)(i).

12.    FDA had statutory authority under the FDCA to conduct inspections of, among other things, any factory, warehouse, or establishment in which foods are manufactured, processed, packed, or held for introduction into interstate commerce or after such introduction.  21 U.S.C. § 374(a)(1)(A).

### Workout and Weight-Loss Dietary Supplements

13.    Two major segments of the dietary supplement industry were workout and weight-loss supplements.  These segments focused, respectively, on products purporting to heighten the impact of exercise and products purporting to help consumers lose weight.  The workout and weight-loss supplement segments were not stable, and they fluctuated up and down depending on the changing popularity of "fad" products.

14.     Some firms who made workout and weight-loss supplements attempted to find and use new or previously-unused ingredients that could be put in new fad products.  These new ingredients were often portrayed as having special properties and having been derived from unique sources like rare plants found in far-flung locations.

15.     These firms wanted to use purported new ingredients from new sources in workout and weight-loss supplements in order to distinguish their products from the competition. Fad products, based on these new ingredients from new sources, typically became popular due to word of mouth among the target audiences—such as persons looking for a competitive edge in bodybuilding or athletics, or ordinary consumers looking to lose weight or control their appetites.

16.     Dietary supplement manufacturers thus recognized the importance of dietary supplement ingredients and the sources of those ingredients.  One important type of document in the dietary supplement industry was called a "certificate of analysis," or "COA."  A COA was designed to be sent along with raw ingredients, and was intended to be a document from the ingredient provider certifying that the ingredient listed in the COA had been tested or otherwise evaluated, and was actually what it purported to be. For example, a dietary supplement manufacturer purchasing fish oil for use in a dietary supplement would typically obtain a COA from the fish oil manufacturer stating that the ingredient being sent was actually fish oil and had been tested to ensure it did not contain dangerous levels of mercury or other toxic substances.

## Dietary Supplement Retailers

17.     Workout and weight-loss supplements were sold in large, national dietary supplement retail chains as well as online retailers.  Workout and weight-loss supplements were also sold in so-called "big box" retailers, pharmacies, and smaller specialty stores throughout the country.

18.     Retailers and wholesalers in the dietary supplement industry did not independently verify the claims that manufacturers made about their dietary supplements.  Instead, they relied on the representations made by manufacturers—such as on product labeling and in COAs—to determine that the products were lawful to sell and actually contained what they purported to contain.  Retailers and wholesalers therefore depended on their ability to obtain accurate information from manufacturers in order to ensure that they knew what they were selling.

## USP Labs and Its Business Practices

19.     **USP Labs** started out as a relatively small dietary supplement company that primarily sold workout supplements direct to consumers.  At least as early as 2008, **USP Labs** began seeking to formulate new supplements in the workout and weight-loss segments of the dietary supplement industry.  **USP Labs** did not manufacture any products itself at its facilities in Dallas, Texas, but rather—as is typical in the dietary supplement industry—contracted out the manufacturing to other companies.  One of those companies was Anaheim, California-based **S. K. Laboratories**.

20.     One of the primary ways **USP Labs** sought to set its products apart from competitors was by its choices of ingredients.  In November 2008, **USP Labs** began

selling a dietary supplement called Jack3d, which was followed by a dietary supplement called OxyElite Pro in November 2009. Both Jack3d and OxyElite Pro originally contained a substance called 1,3-dimethylamylamine ("DMAA"), which is also known as methylhexaneamine. The DMAA used in Jack3d and OxyElite Pro was a synthetic stimulant manufactured in China. A stimulant is a substance designed to give users a boost of energy, or a "rush." The DMAA **USP Labs** used was synthetic, meaning that it was made from chemicals in a factory, not obtained from nature.

21.     **USP Labs** had been introduced to the substance by **S. K. Laboratories** and its vice president, **Sitesh Patel**. **USP Labs** and its principal **Jacobo Geissler** were concerned about importing large amounts of DMAA, which **Jacobo Geissler** referred to as a "questionable powder." **Jacobo Geissler** was concerned because, as he told **Sitesh Patel** in 2008, the "last thing" he wanted was for **USP Labs** to be "on the FDA radar."

22.     **USP Labs, S. K. Laboratories**, and their respective principals recognized that importing and selling purported natural, plant-based substances would be easier than selling synthetic stimulants—both because regulatory agencies would be less likely to question the importation of plant extracts and because retailers would be more willing to sell a product that contained natural ingredients instead of synthetic ones. On this topic, **Sitesh Patel** wrote in a July 2009 email to **Jacobo Geissler** and **Jonathan Doyle**: "[R]etails might be more open if they see it's an extract. Spoke with Jacob about this on the phone we can do it either way, China can just doctor us a COA stating it's an extract. We just need to make sure whatever is used it s[t]ays consistent throughout."

23.     **USP Labs** and its principals embarked on an unmistakable course of conduct where, starting at least with DMAA, they imported numerous shipments of substances intended for human consumption using false and fraudulent COAs, and other false and fraudulent documentation and labeling.  Instead of legitimate COAs that accurately described the ingredients they imported, **USP Labs** and **S. K. Laboratories** frequently caused Chinese chemical suppliers to create and send fake COAs so that the COAs would match the lies **USP Labs** wanted to tell about the ingredients it was using.  For example, in a September 2008 email discussing the creation of Jack3d, **Sitesh Patel** instructed **Jacobo Geissler** and **Jonathan Doyle**:  "Have your supplier create a COA like this."  In that email, **Sitesh Patel** included the text of the fake COA that **USP Labs** would use, nearly word-for-word, to import DMAA for years.

24.     In the case of DMAA, **USP Labs** used fraudulent COAs to portray the chemical it imported as having been extracted from "geranium flower powder" using a "hydro-alcoholic" extraction method at a 200-to-1 ratio.  Regardless of whether DMAA actually occurred in nature, these statements were false because **USP Labs** was using a synthetic stimulant from a Chinese chemical factory, not a substance extracted from geraniums.  In one email exchange from May 2009, **Sitesh Patel** told **Jacobo Geissler** and **Jonathan Doyle** about the DMAA in their products:  "lol stuff is completely 100% synthethic [*sic*]."

25.     The DMAA-containing versions of Jack3d and OxyElite Pro became bestselling dietary supplements in the United States, generating hundreds of millions of dollars in

sales. The extreme success of these products was unexpected, and **USP Labs** often had difficulty meeting demand.

26.    Starting in or around 2010, and continuing for several years, use of DMAA in the dietary supplement industry was the subject of intense controversy. The controversy arose in part because of concerns about the source of DMAA and in part because of concerns about health risks DMAA may pose. **USP Labs** and its principals took steps to quell that controversy because their products were the most successful DMAA-containing products on the market: **USP Labs, Jacobo Geissler, Jonathan Doyle**, and **Cyril Willson** agreed to engage in surreptitious online attacks against competitors whom they believed to be behind negative industry press stories about DMAA. **USP Labs, Jacobo Geissler, Jonathan Doyle**, and **Matthew Hebert** also told lies to certain retailers—including a New Jersey-based company, Company A—claiming falsely that the DMAA in **USP Labs'** products was a natural extract sourced from geranium plants. **Jacobo Geissler** and **Jonathan Doyle** also testified falsely under oath in December 2010, in a case about a professional athlete who failed a drug test because of Jack3d, that **USP Labs** used natural DMAA from geraniums in its products. In early 2012, about a month after the Department of Defense ordered DMAA-containing products pulled from stores on U.S. military bases in order to conduct a safety review of those products, **USP Labs** provided a misleading answer to a dietary supplement industry publication when asked directly whether its DMAA was naturally sourced. **USP Labs'** story about its use of DMAA changed over time, and the company then discontinued use of DMAA in 2013.

27.     At times because of this controversy and at times because of the company's desire
to create the newest "fad" supplement, from at least 2008, until at least 2013, **USP Labs**
also frequently imported other chemicals from China in smaller quantities and under false
labeling in order to be able to test those chemicals to see whether they could be used in
new dietary supplements.  **USP Labs** used false labeling so that these test shipments
would not come under scrutiny by regulatory agencies.  In a typical email exchange,
**Jacobo Geissler** instructed a Chinese chemical supplier, with respect to a number of test
chemicals: "Please send as Green coffee samples and send them all together. . . .  And
don't label the individual bags.  Label as green coffee sample 1, 2, 3 etc."  In another
example, **Jacobo Geissler** instructed a different Chinese chemical supplier: "Please ship
6 Bromo by DHL to address we ship Geranium to.  Please use fake COA."  **Jacobo
Geissler**, **Jonathan Doyle**, and other **USP Labs** employees frequently tested these
chemicals on themselves.

28.     Meanwhile, one of the synthetic test chemicals that **USP Labs** imported from
China was called "aegeline."  The aegeline **USP Labs** used was a synthetic version of an
extract from a tree that is native to India.  **USP Labs** had first imported aegeline in 2011,
and instructed its Chinese supplier to label the bag as "green coffee" in order to avoid
scrutiny by regulatory agencies.  **Jacobo Geissler** took aegeline himself and liked how it
made him feel, so he decided, in 2012, that aegeline would be the replacement for
DMAA in OxyElite Pro.

29.     The first aegeline-containing version of OxyElite Pro, which was called OxyElite
"New Formula" (also called "Super Thermo" and "Purple Top"), went on sale in or

around December 2012, but did not sell as well as the DMAA-containing version. So, **USP Labs** endeavored to reformulate the product again in summer 2013. This time, **Jacobo Geissler** sought to reformulate the product with—in addition to aegeline—an extract from a Chinese herb called cynanchum auriculatum, which **USP Labs** thought might have weight-loss effects.

30.     **Jacobo Geissler** was unable to find the extract itself that he wanted for sale in China, so he agreed that the Chinese supplier would send pulverized roots of cynanchum auriculatum instead. He agreed that the ingredient would be mislabeled upon import as "cynanchum auriculatum root extract" for use in the product. The cynanchum auriculatum powder that **USP Labs** imported was not only much cheaper than an actual extract, but it also contained only minuscule amounts, if any, of the compounds that **USP Labs** believed might have weight-loss effects.

31.     While evaluating cynanchum auriculatum as an ingredient, **USP Labs** recognized that the substance could potentially cause "liver toxicity," but **Jacobo Geissler** and **Cyril Willson** believed that because they were not actually using an extract of the root, there was not enough potentially toxic material in the product to hurt people, even though they had not done a single test to determine whether cynanchum auriculatum—as an extract, as ground-up roots, or otherwise—was safe or effective.

32.     The cynanchum auriculatum-containing product, called OxyElite Pro "Advanced Formula," went on sale in or around August 2013. **Jacobo Geissler** had instructed the Chinese chemical seller to misbrand its shipments of cynanchum auriculatum, which included fake COAs stating falsely that the substance was an ethanol extract. The

product was also intentionally misbranded to declare "cynanchum auriculatum (root) extract" as an ingredient. **USP Labs** released advertisements touting the "hard-hitting super extracts" in OxyElite Pro Advanced Formula, but the first "super extract" the advertisements listed—cynanchum auriculatum (root) extract—was not in the product.

33.     In fall 2013, shortly after OxyElite Pro Advanced Formula went on sale, an outbreak of liver injuries was associated with **USP Labs**' products containing aegeline. Numerous consumers experienced jaundice and other liver-related symptoms, and several consumers needed liver transplants in order to save their lives.

34.     In October 2013, FDA conducted emergency inspections of **USP Labs** and **S. K. Laboratories** in order to identify whether **USP Labs**' products were the source of the liver injury outbreak. **USP Labs** promised FDA and the public that it would cease distribution of OxyElite Pro, but **USP Labs** internally engaged in a surreptitious, all-hands-on-deck effort to sell as much OxyElite Pro as it could as quickly as possible, and attempted to ship the rest of the OxyElite Pro in its possession out of the United States to avoid having FDA seize the product.

35.     During the liver-injury outbreak, **USP Labs** also put out a misleading press release saying that all of the ingredients in OxyElite Pro had been studied and showed "no negative liver issues." In fact, **Jacobo Geissler** and **Cyril Willson** knew that a study had shown "liver issues" with cynanchum auriculatum, and **Jacobo Geissler** quickly instructed that cynanchum auriculatum and aegeline be removed from the product formula going forward.

<u>Count One</u>

Conspiracy to Commit Wire Fraud
(Violation of 18 U.S.C. § 1349 (18 U.S.C. § 1343))
<u>Against Defendants **USP Labs; Jacobo Geissler; Jonathan Doyle; Matthew Hebert;**</u>
<u>**S.K. Laboratories; Sitesh Patel; and Cyril Willson**</u>

36.    The Grand Jury re-alleges and incorporates by reference all of the allegations set

out in Paragraphs 1 through 35 of this Indictment as though fully set forth herein.

## **The Conspiracy and Its Objects**

37.    Beginning in or around October 2008, the exact date being unknown to the Grand

Jury, and continuing thereafter until at least in or around August 2014, in the Dallas

Division of the Northern District of Texas, and elsewhere, the defendants, **USP Labs**,

**Jacobo Geissler**, **Jonathan Doyle**, **Matthew Hebert**, **S. K. Laboratories**, **Sitesh Patel**,

and **Cyril Willson,** did knowingly and willfully combine, conspire, confederate, and

agree with others known and unknown to the Grand Jury, to commit the offense of wire

fraud, in violation of 18 U.S.C. § 1343, by transmitting and causing to be transmitted in

interstate commerce, by means of wire and radio communications, certain writings, signs,

signals, and sounds, for the purpose of executing and attempting to execute a scheme and

artifice to defraud and to obtain money and property from dietary supplement

distributors, retailers, and consumers, by means of materially false and fraudulent

pretenses, representations, and promises.

38.    The object of the conspiracy was to enrich the co-conspirators by using false and

misleading statements, advertisements, documentation, labeling, and illicit payments to

import and sell in interstate commerce a variety of chemicals for human consumption.

## The Manner and Means of the Conspiracy

39.     The manner and means by which the conspiracy and joint scheme and artifice to defraud was sought to be accomplished included:

a.      **USP Labs, Jacobo Geissler, S. K. Laboratories**, and **Sitesh Patel** imported chemicals from Chinese chemical sellers for use in dietary supplements.  Two of the chemicals they imported were DMAA and cynanchum auriculatum root powder, both of which were used in versions of OxyElite Pro.

b.      **USP Labs** and **Jacobo Geissler** instructed and agreed with **Sitesh Patel** and others to have those chemicals shipped with false labeling in interstate commerce.  For example, **Jacobo Geissler** agreed with a Chinese chemical seller to have two metric tons of pulverized cynanchum auriculatum root powder shipped from China to **S. K. Laboratories** in California using the false name "cynanchum auriculatum root extract."

c.      **Sitesh Patel** and **S. K. Laboratories** received fake documentation for shipments of "Geranium Flower (HG) Powder Extract" (which was actually not geranium flower powder extract, but rather DMAA) and "cynanchum auriculatum root extract" (which was actually not cynanchum auriculatum root extract) that arrived at **S. K. Laboratories** in California, and they then incorporated those ingredients into products that were sold to consumers.

d.      **USP Labs, Jacobo Geissler, Jonathan Doyle, S. K. Laboratories**, and **Sitesh Patel** ensured that certain ingredient shipments arriving in the United States for use in **USP Labs**' products bore fraudulent COAs.  In the case of DMAA, those COAs stated falsely, among other things, that the substance in the shipments had been extracted from

the geranium plant using a "hydro-alcoholic" extraction method at a 200-to-1 ratio.  In the case of cynanchum auriculatum, those COAs stated falsely, among other things, that the substance had been extracted using "ethanol."

40.     It was further part of the manner and means of the conspiracy and the joint scheme and artifice to defraud that:

a.     **USP Labs** and **S. K. Laboratories** used fake COAs and other documentation to justify false and misleading product labeling and to prepare manufacturing records, including finished-product COAs, that would make the products appear legitimate.  **USP Labs** also sometimes gave the fake COAs and other documentation to third parties to prove it was using the ingredients it claimed to be using.

b.     In or around May 2010, **USP Labs**, **Jacobo Geissler**, and **Matthew Hebert** emailed and caused to be emailed to Company A, a dietary supplement retailer in New Jersey, false and fraudulent COAs and other statements falsely representing that **USP Labs** got the DMAA in its products from geranium plants.

c.     In or around August 2010, after a private lawsuit was filed against **USP Labs** about the DMAA in Jack3d, **USP Labs**, **Jacobo Geissler**, **Jonathan Doyle**, **Matthew Hebert**, **S. K. Laboratories**, and **Sitesh Patel** took pre-existing COAs for DMAA— which themselves contained false statements that the DMAA had been extracted from the "whole plant"—and altered and attempted to alter those COAs in order to conform them to the false claims made by **USP Labs** that its DMAA was sourced from "geranium stems."

d.    **Jacobo Geissler** and **Jonathan Doyle** testified falsely under oath during depositions in December 2010, that the DMAA in their products was not synthetic, but rather was naturally sourced from geranium plants.

e.    **USP Labs** sent false labels listing "cynanchum auriculatum (root) extract" as an ingredient in OxyElite Pro Advanced Formula to retailers and wholesalers, even though that ingredient was not present in the product.

41.    It was further part of the manner and means of the conspiracy and the joint scheme and artifice to defraud that:

a.    **USP Labs**, **Jacobo Geissler**, **Jonathan Doyle**, **Matthew Hebert**, and **Cyril Willson** made and caused to be made false and misleading statements about the purported ingredients in **USP Labs'** products, such as DMAA and cynanchum auriculatum root powder. In the case of DMAA, the co-conspirators made and caused to be made misleading statements about the purported "geranium" contained in their products, such as in the following promotional guide directed to retail salespeople at Company B, a large dietary supplement retailer:

> *Geranium (stems) = Shown to be more powerful than ephedrine in some respects with zero of the associated side-effects!*

In reality, the co-conspirators did not obtain DMAA from geranium stems. At the time they made these statements, the co-conspirators had no idea whether purported "natural DMAA" from geranium stems had the same properties as the synthetic stimulant they used in their products, nor whether the synthetic stimulant they used had "zero" of the side effects of ephedrine.

b.      In the case of cynanchum auriculatum, the co-conspirators made and caused to be made misleading statements such as in the following advertisement directed at the public:

> *Cynanchum Auriculatum (Root) Extract*
>
> *This herb is native to Asian temperate and tropical regions such as China and Nepal. It's long been used as food and for a variety of purposes by those in these regions.*
>
> *More recently, ethanol extracts derived from the roots of this herb have been studied both in vitro and in vivo; producing exciting emerging data.*

In reality, the extracted ingredient **USP Labs** advertised was not in the product.

42.     It was further part of the manner and means of the conspiracy and the joint scheme and artifice to defraud that, around the time when Company B began questioning **USP Labs'** use of DMAA and telling **USP Labs** to reformulate Jack3d and OxyElite Pro, **USP Labs**, **Jacobo Geissler**, and **Jonathan Doyle** began directing illicit kickback payments to Person X, a corporate employee of Company B involved in ordering and distributing **USP Labs'** products, with the intent of ensuring that special attention was paid to **USP Labs'** products by Company B.

43.     Retailers and wholesalers relied on the statements and documentation **USP Labs** provided about its products. **USP Labs'** misrepresentations during the conspiracy described in this Count allowed **USP Labs** to establish its products as mainstream best sellers in the dietary supplement industry, and those misrepresentations further prevented retailers from removing **USP Labs'** products from the stream of commerce despite various concerns regarding the sale of those products.

44.     During the period from in or around October 2008 through October 2013, the conspirators collected at least $400,000,000 in revenue that they would not have obtained absent the conspiracy described in this Count.

All in violation of 18 U.S.C. § 1349.

Counts Two to Five

Wire Fraud<br>
(Violation of 18 U.S.C. § 1343)<br>
<u>Against Defendants **USP Labs; Jacobo Geissler; Jonathan Doyle; Matthew Hebert;<br>
S. K. Laboratories; Sitesh Patel; and Cyril Willson**</u>

45.     The Grand Jury re-alleges and incorporates by reference all of the allegations set

out in Paragraphs 1 through 35 of this Indictment as though fully set forth herein.

**The Scheme and Artifice to Defraud**

46.     From at least in or around October 2008, until in or around August 2014, in the

Dallas Division of the Northern District of Texas, and elsewhere, the defendants, **USP**

**Labs, Jacobo Geissler, Jonathan Doyle, Matthew Hebert, S. K. Laboratories, Sitesh**

**Patel**, and **Cyril Willson,** knowingly devised and intended to devise a scheme and

artifice to defraud and to obtain money and property from retailers, distributors, and

consumers of dietary supplements by materially false and fraudulent pretenses,

representations, and promises.

**The Manner and Means of the Scheme and Artifice**

47.     Paragraphs 39 through 44 are re-alleged and incorporated by reference as though

fully set forth herein as a description of the scheme and artifice.

**The Execution of the Scheme and Artifice**

48.     On or about the following dates, in the Northern District of Texas, and elsewhere,

for the purpose of knowingly executing the scheme and artifice to defraud, and

attempting to do so, **USP Labs, Jacobo Geissler, Jonathan Doyle, Matthew Hebert, S.**

**K. Laboratories, Sitesh Patel**, and **Cyril Willson** did cause to be transmitted in

interstate commerce, by means of wire communications and writings—that is, false and

fraudulent COAs and other documents, instructions to create false documents, and other

false and fraudulent statements in emails—as set forth in each Count below:

| Count | Date | From (Location) | To (Location) | Contents of Email |
|-------|------|-----------------|---------------|-------------------|
| 2 | 5/14/2010 | **Matthew Hebert (Massachusetts)** | Person Z (New Jersey); **Jacobo Geissler (Texas)** | Fraudulent "Geranium" COA and email telling retailer that **USP Labs'** DMAA was a natural extract |
| 3 | 8/16/2010 | **Jonathan Doyle (Texas)** | **Sitesh Patel (California)** | Email chain discussing altering "Geranium" COAs to contain false information |
| 4 | 9/28/2010 | Person Y (Texas) | **Sitesh Patel (California)** | Documents for a shipment of "Geranium" for use in **USP Labs'** products including fake COA altered at co-schemers' direction |
| 5 | 8/12/2013 | **Cyril Willson (Nebraska)** | **Jonathan Doyle (Texas)** | Draft product advertisement featuring false claims about cynanchum auriculatum (root) extract that were ultimately included on **USP Labs'** website |

All in violation of 18 U.S.C. § 1343.

Count Six

Obstruction of an Agency Proceeding
(Violation of 18 U.S.C. § 1505 and 18 U.S.C. § 2)
Against Defendants **USP Labs; Jacobo Geissler; Jonathan Doyle; and Matthew Hebert**

49.     The Grand Jury re-alleges and incorporates by reference all of the allegations set out in Paragraphs 1 through 35 and 39 through 44 of this Indictment as though fully set forth herein.

50.     In October 2013, FDA was conducting an investigation in response to reports of an outbreak of liver injuries associated with **USP Labs'** products containing aegeline. Among other things, investigators were conducting inspections of **USP Labs** in Dallas as well as other facilities storing **USP Labs'** products to determine whether **USP Labs'** products containing aegeline were responsible for the outbreak.

51.     **USP Labs, Jacobo Geissler, Jonathan Doyle**, and **Matthew Hebert** were aware of FDA's investigation into its aegeline-containing products.

52.     On or about October 8, 2013, **USP Labs** promised FDA that it would "cease distribution" of OxyElite Pro products.

53.     Thereafter, **USP Labs, Jacobo Geissler, Jonathan Doyle**, and **Matthew Hebert** distributed and caused the distribution of OxyElite Pro in order to, among other things, prevent FDA from exercising its regulatory powers to seize the products and otherwise respond to the outbreak.  During the liver-injury outbreak and after **USP Labs'** promise to FDA, **USP Labs** employees sold aegeline-containing products over the phone in order to avoid creating a paper trail.

54.    **USP Labs, Jacobo Geissler, Jonathan Doyle,** and **Matthew Hebert** otherwise corruptly attempted to obstruct and impede FDA's investigation by failing to provide material information about OxyElite Pro, the anticipated shipments thereof, and the promotional activities therefor.

55.    Beginning on or about October 8, 2013, in the Dallas Division of the Northern District of Texas, and elsewhere, and continuing until on or about November 11, 2013, the defendants, **USP Labs, Jacobo Geissler, Jonathan Doyle,** and **Matthew Hebert,** aiding and abetting one another, did corruptly influence, obstruct, impede and endeavor to influence, obstruct and impede the due and proper administration of law under which a proceeding was being held before the United States Food and Drug Administration, an agency of the United States.

All in violation of 18 U.S.C. §§ 1505 and 2.

<u>Count Seven</u>

Conspiracy to Introduce Misbranded Food Into Interstate Commerce
With an Intent to Defraud and Mislead
(Violation of 18 U.S.C. § 371 (21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2)))
<u>**Against Defendants USP Labs; Jacobo Geissler; Jonathan Doyle; Matthew Hebert;**
**S. K. Laboratories; Sitesh Patel; and Cyril Willson**</u>

56.     The Grand Jury re-alleges and incorporates by reference all of the allegations set

out in Paragraphs 1 through 35 and Paragraphs 39 through 44 of this Indictment as

though fully set forth herein.

57.     In exercising their regulatory powers, FDA and other government agencies relied

on the labeling contained in and otherwise accompanying interstate shipments of food to

identify the contents.

## **The Conspiracy and Its Objects**

58.     Beginning in or around October 2008, the exact date being unknown to the Grand

Jury, and continuing thereafter until at least in or around August 2014, in the Dallas

Division of the Northern District of Texas, and elsewhere, the defendants, **USP Labs**,

**Jacobo Geissler**, **Jonathan Doyle**, **Matthew Hebert**, **S. K. Laboratories**, **Sitesh Patel**,

and **Cyril Willson,** did knowingly and willfully combine, conspire, confederate, and

agree with others known and unknown to the Grand Jury, to commit an offense against

the United States, that is, to introduce misbranded food into interstate commerce with an

intent to defraud and mislead, in violation of 21 U.S.C. § 331(a) and 21 U.S.C. §

333(a)(2).

59.     The object of the conspiracy was to avoid law enforcement attention and match

imported substances with false and misleading product labeling by importing and

shipping in interstate commerce a variety of chemicals for use in dietary supplements with false labeling, rendering the items misbranded under 21 U.S.C. § 343(a)(1).

## The Manner and Means of the Conspiracy

60.     The manner and means by which the conspiracy was sought to be accomplished included, among other things, the following:

a.      It was part of this conspiracy that **USP Labs, Jacobo Geissler**, and **Cyril Willson** identified chemicals that they wanted to test as prospective dietary supplement ingredients and use as actual dietary supplement ingredients.

b.      It was part of this conspiracy that **USP Labs** ordered chemicals from Chinese chemical sellers as prospective and actual ingredients for use in dietary supplements, and instructed and agreed to have those powders labeled falsely as other food substances.

c.      It was part of this conspiracy that **S. K. Laboratories** and **Sitesh Patel** received chemicals from and on behalf of **USP Labs** with the knowledge that those chemicals were labeled falsely as other substances.

## Overt Acts

61.     On or about September 28, 2010, **Sitesh Patel** and **S. K. Laboratories** received documentation for a shipment of 1,000 kilograms of "Geranium Flower (HG) Powder Extract" that was scheduled to arrive at **S. K. Laboratories** in California after having been shipped from Texas. **Sitesh Patel** and **S. K. Laboratories** knew that the labeling of the shipment was false because the substance in the shipment was not Geranium Flower Powder Extract, but was instead DMAA, a synthetic stimulant.

62.     On or about December 8, 2011, **Jacobo Geissler** instructed a Chinese chemical

seller via email to misbrand a shipment of nine different chemicals (Norathyriol

Annuloline, Aegelin, Tembamide, N-Benzoyltyramine, Alatamide, N-benzoyl tyramine

methyl ether, N-(2-[3,4-dimethoxyphenyl]ethyl)-3,4-dimethoxyphenylacetamide, and

Herclavine) sent from China to **USP Labs** in Texas by writing: "Please send as Green

coffee samples and send them all together. . . . And don't label the individual bags.

Label as green coffee sample 1, 2, 3 etc."

63.     On or about June 15, 2013, **Jacobo Geissler** agreed with a Chinese chemical seller

to have two metric tons of ground cynanchum auriculatum root powder shipped

internationally to **S. K. Laboratories** in California, for inclusion in **USP Labs**' products,

using the false name "cynanchum auriculatum root extract."

        All in violation of 18 U.S.C. § 371 (21 U.S.C. § 331(a) and 21 U.S.C. §

333(a)(2)).

<u>Count Eight</u>

Introduction of Adulterated Food Into Interstate Commerce
With an Intent to Defraud and Mislead
(Violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2) and 18 U.S.C. § 2)
<u>Against Defendants **USP Labs** and **Jacobo Geissler**</u>

64.     The Grand Jury re-alleges and incorporates by reference all of the allegations set out in Paragraphs 1 through 35 and Paragraphs 39 through 44 of this Indictment as though fully set forth herein.

65.     On or about October 4, 2013, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendants, **USP Labs** and **Jacobo Geissler**, aiding and abetting one another, with the intent to defraud and mislead, caused the shipment of misbranded OxyElite Pro "Advanced Formula" in interstate commerce.  The food was misbranded under the FDCA because its labeling, which falsely declared cynanchum auriculatum (root) extract as an ingredient even though it was not contained in the product, "[was] false [and] misleading."  21 U.S.C. § 343(a)(1).

All in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2) and 18 U.S.C. § 2.

Count Nine

Introduction of Misbranded Food Into Interstate Commerce
(Violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1))
Against Defendants **Jonathan Doyle; Matthew Hebert; Kenneth Miles; S. K.
Laboratories; and Sitesh Patel**

66.    The Grand Jury re-alleges and incorporates by reference all of the allegations set out in Paragraphs 1 through 35 and 39 through 44 of this Indictment as though fully set forth herein.

67.    At all times relevant to this count, **Kenneth Miles** was the quality assurance executive in charge of ensuring the compliance of **USP Labs'** products with the FDCA.

68.    On or about October 4, 2013, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendants, **Jonathan Doyle**, **Matthew Hebert**, **Kenneth Miles**, **S. K. Laboratories**, and **Sitesh Patel,** shipped and caused the shipment of misbranded OxyElite Pro "Advanced Formula" in interstate commerce, in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1).  The food was misbranded under the FDCA because its labeling, which falsely declared cynanchum auriculatum (root) extract as an ingredient even though it was not contained in the product, "[was] false [and] misleading." 21 U.S.C. § 343(a)(1).

All in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1).

<u>Count Ten</u>

Introduction of Adulterated Dietary Supplement Into Interstate Commerce
(Violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1))
<u>Against Defendants **USP Labs; Jacobo Geissler; Jonathan Doyle; Matthew Hebert;**
**Kenneth Miles; S. K. Laboratories; and Sitesh Patel**</u>

69.    The Grand Jury re-alleges and incorporates by reference all of the allegations set

out in Paragraphs 1 through 35, 39 through 44, and Paragraph 67 of this Indictment as

though fully set forth herein.

70.    On or about February 21, 2013, in the Dallas Division of the Northern District of

Texas, and elsewhere, the defendants, **USP Labs**, **Jacobo Geissler**, **Jonathan Doyle**,

**Matthew Hebert**, **Kenneth Miles**, **S. K. Laboratories**, and **Sitesh Patel**, shipped and

caused the shipment of adulterated OxyElite Pro "New Formula" (also known as

OxyElite Pro "Super Thermo" and "Purple Top") in interstate commerce, in violation of

21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1).  The dietary supplement was adulterated

because it was "a dietary supplement . . . that present[ed] a significant or unreasonable

risk of illness or injury under conditions of use recommended or suggested in labeling."

21 U.S.C. § 342(f)(1)(A)(i).

All in violation of 21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1).

Count Eleven

Conspiracy to Commit Money Laundering
(Violation of 18 U.S.C. § 1956(h))
Against Defendants **USP Labs; Jacobo Geissler; Jonathan Doyle; and Matthew
Hebert**

71.     From on or about June 2010, through February 2015, in the Northern District of

Texas, and elsewhere, the defendants, **USP Labs**, **Jacobo Geissler**, **Jonathan Doyle**, and

**Matthew Hebert**, did knowingly combine, conspire, and agree with each other and with

other persons known and unknown to the Grand Jury to commit offenses against the

United States in violation of Title 18, United States Code, Sections 1956 and 1957, to

wit:

a.      To knowingly conduct and attempt to conduct financial transactions

affecting interstate commerce and foreign commerce, which transactions involved the

proceeds of specified unlawful activity, that is, wire fraud and conspiracy to commit wire

fraud, knowing that the transactions were designed in whole or in part to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of specified

unlawful activity, and that while conducting and attempting to conduct such financial

transactions, knew that the property involved in the financial transactions represented the

proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b.      To knowingly engage and attempt to engage, in monetary transactions by,

through or to a financial institution, affecting interstate and foreign commerce, in

criminally derived property of a value greater than $10,000, with such property having

been derived from a specified unlawful activity, that is, wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1957.

## The Manner and Means of the Conspiracy

72.  It was part of the conspiracy that **USP Labs**, **Jacobo Geissler**, **Jonathan Doyle**, and **Matthew Hebert** and other persons both known and unknown to the Grand Jury:

a.  Transferred over $230,000,000 of the wire fraud and wire fraud conspiracy proceeds from the **USP Labs** business account at Chase to the **USP Labs** Charles Schwab accounts;

b.  Once received in the **USP Labs** Charles Schwab accounts, transferred over $154,000,000 to at least 21 other financial accounts maintained at Charles Schwab, Chase Bank, TD Ameritrade Bank, TD Bank, and Bank of America;

c.  Moved assets through seemingly unrelated shell business entities and concealed the source and nature of the proceeds derived from wire fraud and conspiracy to commit wire fraud in order to hide assets from victims of **USP Labs'** illegal conduct and from the government; and

d.  Commingled the proceeds derived from wire fraud and conspiracy to commit wire fraud with legitimately earned assets in an effort to conceal the true source and nature of the criminally derived funds.

All in violation of 18 U.S.C. § 1956(h), the penalty for which is set forth in 18 U.S.C. § 1956(a)(1).

Notice of Forfeiture
[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1)(A)]

74.    The allegations contained in Counts One through Count Eleven of this Indictment are hereby realleged and incorporated by reference for the purpose of criminal forfeiture.

75.    Upon conviction for any of the offenses set forth in Counts One through Five of this Indictment, the defendants, **USP Labs, Jacobo Geissler, Jonathan Doyle, Matthew Hebert, Kenneth Miles, S.K. Laboratories, Sitesh Patel,** and **Cyril Willson,** shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the respective offense.

76.    Upon conviction for the offense set forth in Count Eleven of this Indictment, the defendants, **USP Labs, Jacobo Geissler, Jonathan Doyle,** and **Matthew Hebert,** shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1)(A), any property, real or personal, involved in, or traceable to property involved in, the offense.

77.    The property to be forfeited includes, but is not limited to, the following:

Financial Accounts:

a.    All funds, monies, and things of value contained in Account #9137-1801, in the name of Doyle Family Investments LLC at Charles Schwab.

b.    All funds, monies, and things of value contained in Account #7235-5867, in the name of Doyle Family Investments LLC (DFI 1) at Charles Schwab.

c.    All funds, monies, and things of value contained in Account #2093-6547, in the name of DFI2 at Charles Schwab.

d.    All funds, monies, and things of value contained in Account #5912-1116, in the name of DFI3 DE LLC at Charles Schwab.

e.    All funds, monies, and things of value contained in Account #9423-5302, in the name of JVD DE LLC at Charles Schwab.

f.    All funds, monies, and things of value contained in Account #6973-4499, in the name of CHD DE LLC at Charles Schwab.

g.    All funds, monies, and things of value contained in Account #5843-0481, in the name of DVJ-ETH LLC at Charles Schwab.

h.    All funds, monies, and things of value contained in Account #9245-3809, in the name of Jon Doyle TTEE USPLabs LLC Retirement Plan FBO Jon Doyle at Charles Schwab.

i.    All funds, monies, and things of value contained in Account #4413-1720, in the name of Jon Doyle TTEE USPLabs LLC Retirement Plan FBO Jacob Geissler at Charles Schwab.

j.    All funds, monies, and things of value contained in Account #2102-2960, in the name of Jacob E Geissler at Charles Schwab.

k.    All funds, monies, and things of value contained in Account #2618-3391, in the name of JG Ventures LLC at Charles Schwab.

l.    All funds, monies, and things of value contained in Account #5211-4965, in the name of JG Ventures LLC at Charles Schwab.

m.    All funds, monies, and things of value contained in Account #3682-0734, in the name of Geissler Investments LLC at Charles Schwab.

n.    All funds, monies, and things of value contained in Account #4318-2228, in the name of Geissler Investments LLC at Charles Schwab.

o.    All funds, monies, and things of value contained in Account #3633-3489, in the name of Geissler Investments LLC Portfolios at Charles Schwab.

p.    All funds, monies, and things of value contained in Account #3949-6550, in the name of JEG Investments LLC at Charles Schwab.

q.     All funds, monies, and things of value contained in Account #4148-9742, in the name of JEG Investments LLC at Charles Schwab.

r.     All funds, monies, and things of value contained in Account #8237-4961, in the name of JEG Investments LLC Portfolios at Charles Schwab.

s.     All funds, monies, and things of value contained in Account #9868-1193, in the name of JEG Investments DE LLC at Charles Schwab.

t.     All funds, monies, and things of value contained in Account #8265-7257, in the name of JEG Endeavors at Charles Schwab.

u.     All funds, monies, and things of value contained in Account #3506-2445, in the name of GS-ETH LLC at Charles Schwab.

v.     All funds, monies, and things of value contained in Account #1585-2243, in the name of ETH Insurance Company Inc. at Charles Schwab.

w.     All funds, monies, and things of value contained in Account #5995-7559, in the name of Straight CH Insurance Inc. at Charles Schwab.

x.     All funds, monies, and things of value contained in Account #7812-4442, in the name of BFB Insurance Company Inc. at Charles Schwab.

y.     All funds, monies, and things of value contained in Account #1827-5797, in the name of M19 Eleven Insurance Company at Charles Schwab.

z.     All funds, monies, and things of value contained in Account #6887-5723, in the name of RB Investments DE LLC at Charles Schwab.

aa.    All funds, monies, and things of value contained in Account #3368-5718, in the name of RB Investments DE LLC at Charles Schwab.

bb.    All funds, monies, and things of value contained in Account #5253-5132, in the name of RB Investments DE LLC at Charles Schwab.

cc.   All funds, monies, and things of value contained in Account #9140-2357, in the name of Charitable Fund-Jacob and Ruth Donor at Charles Schwab.

dd.   All funds, monies, and things of value contained in Account #6043-4243, in the name of Hebert Investments at Charles Schwab.

ee.   All funds, monies, and things of value contained in Account #916-063170, in the name of Hebert Investments LLC at TD Ameritrade.

ff.   All funds, monies, and things of value contained in Account #51726890, in the name of JG Ventures LLC at Raymond James.

gg.   All funds, monies, and things of value contained in Account #676201922, in the name of Geissler Investments LLC at Fidelity Investments.

hh.   All funds, monies, and things of value contained in Account #824-6265181, in the name of Matthew Hebert at TD Bank.

ii.   All funds, monies, and things of value contained in Account #872-9060834, in the name of Matthew Hebert at TD Bank.

jj.   All funds being held by or placed with the Internal Revenue Service concerning or related to Internal Revenue Code 6603 and taxpayer(s) Jonathan Doyle.

Real Property:

kk.   The real property located at 8001 Tulane St., Dallas, Dallas County, Texas, more specifically described as Lot 11, in Block 49, of University Heights, Fifth Installment, an Addition to the City Of University Park, Dallas County, Texas, according to the Map thereof recorded in Volume 7, Page 123, of the Map Records of Dallas County, Texas.

ll.   The real property located at 3538 Miles St., Dallas, Dallas County, Texas, more specifically described as Lot 16B, Block 6/2467 of Bowser-Miles Addition, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 2001122, Page 2013, Map Records, Dallas County, Texas.

mm.   The real property located at 4723 Royal Lane, Dallas, Dallas County, Texas, more specifically described as Lot 4, Block 1/5503 of Royal Gardens Addition, an Addition to the City of Dallas, Dallas

County, Texas, According to the Map thereof recorded in Volume 15, Page 139, of the Map Records of Dallas County, Texas.

nn.   The real property located at 6725 Stichter Ave., Dallas, Dallas County, Texas, more specifically described as Lot 5, in Block 2/5489, of Crest Manor Estates, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof Recorded in Volume 20, PAGE 233, of the Map Records of Dallas County, Texas.

Vehicles:

oo.   2013 Ford F150, VIN 1FTFW1R67DFB97578.

pp.   2013 Mercedes Benz ML350, VIN 4JGDA5JB2DA168066.

qq.   2013 Mercedes Benz S63, VIN WDDNG7EB0DA511749.

rr.   2012 Ford Expedition, VIN 1FMJU1K50CEF01609.

ss.   2013 Mercedes-Benz ML350, VIN 4JGDA5JB0DA196870.

tt.   2013 Ferrari 458, VIN ZFF67NFA8D0192116.

78.   If any of the property described above, as a result of any act or omission of the defendants cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall pursue and be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
ERRIN MARTIN
Assistant United States Attorney
Northern District of Texas
Texas State Bar No. 24032572
1100 Commerce St., Third Floor
Dallas, Texas 75242-1699
Telephone:   214.659.8600
E-mail:      errin.martin@usdoj.gov

_____
DAVID SULLIVAN
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
Telephone:   202.616.0219
E-mail:      david.sullivan2@usdoj.gov

_____
PATRICK R. RUNKLE
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
Telephone:   202.616.0219
E-mail:      patrick.r.runkle@usdoj.gov

Indictment – Page 35

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

USPLABS, LLC, A TEXAS CORPORATION;
JACOBO GEISSLER (a.k.a Jacob Geissler);
JONATHAN DOYLE;
MATTHEW HEBERT;
KENNETH MILES;
S. K. LABORATORIES, INC., a California Corporation;
SITESH PATEL; and
CYRIL WILLSON (a.k.a ERIK WHITE).

---

FIRST SUPERSEDING INDICTMENT

18 USC § 1349 (18 U.S.C. § 1343)
Conspiracy to Commit Wire Fraud

18 U.S.C. § 1343
Wire Fraud

18 U.S.C. § 1505 and 18 U.S.C. § 2
Obstruction of Agency Proceeding

18 U.S.C. § 371 (21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2))
Conspiracy to Introduce Misbranded Food Into Interstate Commerce
With an Intent to Defraud and Mislead

21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(2) and 18 U.S.C. § 2
Introduction of Adulterated Food Into Interstate Commerce
With an Intent to Defraud and Mislead

21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1)
Introduction of Misbranded Food Into Interstate Commerce

21 U.S.C. § 331(a) and 21 U.S.C. § 333(a)(1)
Introduction of Adulterated Dietary Supplement Into Interstate Commerce

18 U.S.C. § 1956(h)
Conspiracy to Commit Money Laundering

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1)(A)
Notice of Forfeiture

11 Counts

---

A true bill rendered

------------------------------------------------------------------------------

DALLAS                                                          FOREPERSON

Filed in open court this 5th day of January, 2016.

------------------------------------------------------------------------------

------------------------------------------------------------------------------
                                                                        Clerk

**No Warrant Needed**

------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
Magistrate Court Number:  3:15-CR-00496-L