IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:15-cr-00496-L |
| USPLABS, LLC          (1)<br>JACOBO GEISSLER     (2)<br>JONATHAN DOYLE     (3)<br>MATTHEW HEBERT     (4) | |

### DEFENDANTS USPLABS, LLC, JONATHAN DOYLE, JACOBO GEISSLER, AND MATTHEW HEBERT'S REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF A PROTECTIVE ORDER

Defendants USPlabs, LLC ("USPlabs"), Jonathan Doyle, Jacobo Geissler, and Matthew Hebert (collectively, "Defendants") file this brief in support of their reply to the Government's response to Defendants' motion requesting entry of a protective order and discovery relating to the Government's handling of attorney-client privileged materials it seized from Defendants USPlabs and Geissler and would respectfully show the Court as follows.

# **TABLE OF CONTENTS**

I.    DEFENDANTS' REQUESTED RELIEF IS "APPROPRIATE" UNDER RULE 16(D)(1)................................................................................................................ 1

II.   THE GOVERNMENT FAILS TO ESTABLISH THAT ITS REPEATED INTRUSIONS INTO DEFENDANTS' PRIVILEGE WERE APPROPRIATE. ....................................... 3

    A.    The Government's Warrant Applications Kept The Issuing Magistrates In The Dark Regarding The Risks of Intrusion Into Defendants' Privileged Communications. ................................................................................................... 3

    B.    The Government's Execution of The Search Warrants Was Reckless, and Resulted In The Collection Of Privileged Information By the Prosecution Team . 4

    C.    The Limited Information Provided by the Government Regarding The Privilege Filter Process Reveals Justifies Further Discovery On This Issue ......................... 6

    D.    The Government's Frequent Communication With Plaintiffs' Attorneys and Media Outlets Is Further Justification For The Requested Relief .......................... 9

III.  CONCLUSION............................................................................................................ 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Pedersen*,
   No. 3:12-cr-00431-HA, 2014 WL 3871197 (D. Or. Aug. 6, 2014) ............................................ 1

*United States v. Jarman*,
   847 F.3d 259 (5th Cir. 2017) ................................................................................................. 3, 4

*United States v. Triumph Capital Group, Inc.*,
   211 F.R.D. 31 (D. Conn. 2002) ................................................................................................. 4

*United States v. BP Prod. N. Am. Inc.*,
   No. CRIM. H-07-434, 2008 WL 501321 (S.D. Tex. Feb. 21, 2008) .......................................... 9

**Statutes**

5 U.S.C. § 552a(b)(2) ....................................................................................................................... 9

18 U.S.C. § 3771(e) ......................................................................................................................... 9

18 U.S.C. § 3771(a)(5) ..................................................................................................................... 9

**Rules**

Fed R. Crim. P. 16(d)(1) ............................................................................................................. 1, 2

Fed R. Crim. P. 16(a)(2) ............................................................................................................. 1, 2

Fed R. Crim. P. 16(a)(1)(E)(i) ......................................................................................................... 2

**Other Authorities**

Charles Alan Wright, 2 Fed. Prac. & Proc. § 262 (3d ed. 2000) ................................................. 1

United States Attorneys' Manual § 9-13.420 .................................................................................. 5

DOJ System of Records,
   http://www.justice.gov/ocpl/doj-systems-records ..................................................................... 9

### I. DEFENDANTS' REQUESTED RELIEF IS "APPROPRIATE" UNDER RULE 16(D)(1).

The Government's argument that the relief Defendants have requested is unavailable under Rule 16 is off the mark.[1] Rule 16(d)(1) permits courts to "for good cause, deny, restrict or defer discovery or inspection, *or grant other appropriate relief.*" Fed. R. Crim. P. 16(d)(1) (emphasis added). The Government's reading of Rule 16(d)(1) effectively (and literally) removes this last clause from the statute. *See* Opp. at 4 ("The protective order standard governs when a party asks for an order that would 'deny, restrict, or defer discovery or inspection.' Fed. R. Crim. P. 16(d)(1)."). Indeed, the ability of the court to fashion appropriate discovery-related relief under Rule 16(d)(1) has been recognized as "vast." CHARLES ALAN WRIGHT, 2 FED. PRAC. & PROC. § 262 (3d ed. 2000).[2] Each of Defendants' requested forms of relief are an "appropriate" means of regulating the discovery of Defendants' privileged information.

In particular, Defendants' request for information concerning the Government's privilege filtering process is critical to confirming whether the Government is adequately ensuring that its case against Defendants is not in any way based on the content of any privileged communications between Defendants and its attorneys. Rule 16(a)(2) does not, as the Government argues (Opp. at 6), preclude the Court from granting this relief, because Defendants do not seek any internal documents currently in existence that were "made by [the Government]

---

[1] The Government incorrectly argues that Messrs. Geissler, Doyle and Hebert "lack standing to challenge the search warrant affidavits." Opp. 10. The authorities the Government cites for this proposition, however, address a defendant's standing to seek the exclusion of evidence based on Constitutionally deficient search warrants. *See id.* at 10 n.3 (citing cases). Messrs. Geissler, Doyle and Hebert do not seek the exclusion of evidence at this time; rather, they seek a protective order based on a pattern of indifference toward Defendants' privileges, of which the Government's approach toward its search warrant applications is but one example. Moreover, as explained Defendants' Motion to Quash The Grand Jury Subpoena (ECF No. 176), each of these Defendants used USPlabs computers and server to communicate with others (including their personal attorneys) regarding personal business. Of course, Mr. Geissler has standing to bring this Motion for the independent reason that one of the search warrants at issue was executed on his personal residence.

[2] *Accord United States v. Pedersen*, No. 3:12-cr-00431-HA, 2014 WL 3871197, at *31 (D. Or. Aug. 6, 2014) (recommending guideline that "defense counsel should be provided with a copy of the filter protocol at the earliest possible opportunity, preferably before the protocol is employed and a copy should be filed with the court").

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 1**

in connection with investigating or prosecuting the case."[3]  Most of what Defendants seek is descriptions of information that the Government can provide without turning over any pre-existing documents, and to the extent the requested relief covers any pre-existing documents, those documents by definition are not prosecution or investigation documents, but concern areas that are, by virtue of being related to the taint process, outside of the realm of the investigation and prosecution of defendants.  Indeed, if Rule 16(a)(2) were construed to preclude the provision of this type of information, it would effectively shield the Government from any meaningful scrutiny of its privilege filter procedures.  Such a result would be particularly troubling where the Government fails to disclose its filter procedure to issuing magistrate judges in its search warrant applications, *which is precisely what happened here*.

The Government's argument that Defendants did not timely object to the use of *any* filter team misses the point.  Defendants challenge the Government's failure to seek prior magisterial approval of the particular filter procedures used here (as well as the adequacy of those procedures).  Moreover, the suggestion that the Government sought Defendants' cooperation with the filter team procedure (Opp. at 7) is outrageously misleading.  The May 2014 communication is between Government attorney Patrick Runkle and counsel for *S.K. Labs*, not counsel for USPlabs.  Counsel for USPlabs was not a party to these email communications or the discussions referenced in this email exchange."[4]

---

[3]   The Government's attempt to re-characterize this requested relief as a request for the discovery of documents under Rule 16(a)(1) demonstrates precisely why Rule 16(d)(1) is the appropriate mechanism for this type of relief.  While the requested information may not be material to preparing [Defendants'] *defense*," Fed. R. Crim. P. 16(a)(1)(E)(i) (emphasis added), and thus may not be discoverable under this subsection of the Rule, it is, to be sure, material to the court's regulation of an important discovery issue and is therefore "appropriate relief" under Rule 16(d)(1).

[4]   The "stark contrast" the Government draws between "defendants' waiver of their objections to the filter team on the one hand, and the assertion of a timely privilege objection" upon the receipt of a grand jury subpoena by one of USPlabs' consultants on the other (Opp. at 7-8), falls flat.  When Eusci, LLC received the subpoena, USPlabs intervened in order to prevent the disclosure of USPlabs' privileged information in Eusci's response.  When it came

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 2

## II. THE GOVERNMENT FAILS TO ESTABLISH THAT ITS REPEATED INTRUSIONS INTO DEFENDANTS' PRIVILEGE WERE APPROPRIATE.

### A. The Government's Warrant Applications Kept The Issuing Magistrates In The Dark Regarding The Risks of Intrusion Into Defendants' Privilege.

In arguing that it did not violate any "binding precedent or legal requirement" in failing to inform the magistrate judges of the existence of privileged documents within the scope of the proposed warrant, and in failing to propose a filtering protocol in its warrant applications to address this issue, the Government ignores the numerous cases Defendants cite demonstrating the widespread practice of prosecutors nationwide in highlighting this information in warrant applications. *See* Mot. 6-7 (discussing cases). In all of those cases, the Government sought prior approval of a filter process, either by highlighting the need for a filter protocol in the warrant application itself, or otherwise seeking court approval prior to the commencement of its review. The Government here took neither of these steps, despite full awareness that the documents it sought to seize in executing the requested warrant contained among them confidential attorney-client communications. Whether or not its failure to do so constitutes a violation of any particular "binding precedent or legal requirement," it certainly demonstrates a desire to play by its own rules when it came to Defendants' privileges.

The Government's reliance upon *United States v. Jarman*, 847 F.3d 259 (5th Cir. 2017), is misplaced. Defendants do not, as the Government claims, argue that filter teams are "per se objectionable" (Opp. 11); rather, they argue that the Government proceeded with a review of data it knew to contain privileged information using a filter protocol lacking court approval.

---

to the privileged materials that had been seized by the Government in November 2013, USPlabs took comfort in the Government's representation that it had put in place a filter team that would prevent the disclosure of Defendants' documents to the prosecution team. Defendants raised its objection to the apparent inadequacy of that process once it became aware of its potential flaws.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 3**

Mot. at 2-7.[5] *Jarman*, if anything, supports Defendants' argument: it recognized that the Government's review of electronic data seized pursuant to a warrant constitutes part of the "search" covered by the warrant. *See Jarman*, 847 F.3d at 266 (treating the Government's review of seized computer data as part of the search covered by the warrant in assessing whether the delay in conducting that review required a new warrant application); *see also United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 45 (D. Conn. 2002) (discussing special agent's review of contents of seized hard drive as part of the search covered by the warrant at issue). The parameters of that search, and in particular a proposal as to how the Government intended to avoid review of privileged documents, should therefore have been included as part of the warrant application, so that the issuing magistrate could assess its reasonableness.[6]

### B.  The Government's Execution of The Search Warrants Was Reckless, and Resulted In The Collection Of Privileged Information By the Prosecution Team.

As argued in Defendants' Motion, before attempting to execute a search warrant covering legally privileged files, internal DOJ policy requires, at a minimum, that (1) either a special master or taint team be in place "[w]hen agents seize a computer that contains legally privileged files [in order] to determine which files contained privileged material," and (2) the AUSA involved provide notice and seek approval from certain DOJ officials where the search will involve an attorney's work premises. *See* Mot. 8-10. The Government conducted its search of

---

[5]  Moreover, it is entirely understandable why *Jarman* was silent on whether the Government is required to include a filter team process in its search warrant affidavits: the affidavit supporting the warrant application at issue in *Jarman* in fact contained a proposed filter team process. *See* Original Br. on Behalf of Defendant-Appellant, *United States v. Jarman*, No. 16-30468, 2016 WL 3996970, at *4-5 (July 22, 2016).

[6]  Finally, in addressing the overbreadth of its application for the search warrant for USPlabs' email provider (*see* Mot. at 7), the Government, rather than attempting to defend its overbroad request, argues that the issue is not relevant to the relief Defendants seek. Opp. at 12. On the contrary: it is one more example of the indiscriminate manner in which the Government has treated Defendants' rights, which undoubtedly resulted in the collection of documents - including privileged documents - falling outside the scope of relevance to the investigation.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 4**

USPlabs' offices and Mr. Geissler's home, even after learning that attorneys worked in those locations, without doing either of these things.

Contrary to the Government's argument, the United States Attorneys' Manual § 9-13.420 does not just apply to law firms and law offices. It specifically provides that it "also applies to searches of business organizations where such searches involve materials in the possession of individuals serving in the capacity of legal advisor to the organization." *Id*. § 9-13.420 Note. Reading this policy to exclude premises other than law firms or law offices would be inconsistent with the concerns underlying the policy, which are "the potential effects of this type of search on legitimate attorney-client relationships," and "the possibility that, during such a search, the government may encounter material protected by a legitimate claim of privilege." *Id*. § 9-13.420.[7] In failing to do either of these things, the Government flouted clear DOJ policy.

Although the Government now claims that it did not seize any privileged material from USPlabs' offices, or review any privileged material seized from the Geissler home, evidence suggests otherwise. First, regarding what was seized from USPlabs offices, in the "OCI Certified Inventory of Evidence" setting forth all items seized at that location, there are items identified as "Taint" material. *See* Ex. 1. Second, despite prior representations that no seized documents were reviewed prior to the filter team's review (*see*, *e.g.*, Garner Decl. ¶ 5), Special Agent Chad Medaris now acknowledges in his most recent declaration that he reviewed "certain" text messages on the seized cellphones prior to a filter review, purportedly to "among other things, ensure public safety and determine whether the targets were engaged in the destruction of evidence prior to or during the searches." Opp. Ex. 2, at 2. Although he does not identify whose

---

[7] It would also be inconsistent with DOJ's own application of the rule: DOJ's Request Form for an "Attorney Search Warrant" contemplates the search of premises other than actual law offices. *See* Ex. 2, at 2.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 5**

cellphones he reviewed, when he reviewed them, how long his review was, or how many text messages his review covered, it appears that those text messages came from the cellphones Mr. Medaris seized from Mr. Geissler and Ruth Brewer, *USPlabs' primary civil litigation attorney*, and appear to have been downloaded by Mr. Medaris[8] into three different Excel spreadsheets.

Astonishingly, a review of these files reveals a whole host of clearly privileged communications between and among Mr. Geissler, Mr. Doyle, Ms. Brewer, and other Brewer Lormand attorneys, concerning topics including, among others, the FDA's inspection of USPlabs after purported outbreak of liver injuries in Hawaii in Fall 2013, and the Government's execution of the search warrants in November 2013. Mr. Medaris's decision to review texts from a phone he knew to belong to USPlabs' lawyer, all under the pretext of "public safety" and "destruction of evidence" concerns, is an brazen display of investigative overreach, and at the very least further underscores the need for a protective order that imposes judicially enforceable restraints on the prosecution team's treatment of Defendants' documents.

### C. The Limited Information Provided by the Government Regarding The Privilege Filter Process Reveals Justifies Further Discovery On This Issue.

In arguing that its filter process adequately protects Defendants' privileged documents, the Government submits the declaration of Lisa Hsiao, a DOJ trial attorney. This is the second declaration it has submitted to the Court in support of its privilege filter process; the first, from Grace Garner, a contract law clerk at DOJ, was submitted in connection with the Government's Cross-Motion Regarding Privilege. ECF No. 141. The accounts of Ms. Hsiao and Ms. Garner,

---

[8]   The metadata for each of these three files, which were found in the Taint Production, identifies Agent Medaris in the "Email From" and "Author" fields. Defendants are willing, at the Court's request, to present these files for the Court's *in camera* review.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 6**

however, are materially inconsistent, rendering the limited information the Government has provided to date on this topic unreliable.

Most critically, the two declarants differ on what documents the filter team reviewed. Ms. Garner represents that the filter team reviewed "all of the electronic materials obtained via search warrant to identify if there were potential attorney-client or attorney work product materials" therein. Garner Decl. ¶ 4. Ms. Hsiao, on the other hand, represents that the team reviewed only those documents from the search warrant materials that were identified in a search result using "a comprehensive list of several hundred search terms." Hsiao Decl. ¶ 5. [9]

Beyond these inconsistencies, Ms. Hsiao's explanations regarding whether the prosecution team has access to the five privileged documents identified in Defendants' Motion are bewildering. Although Ms. Hsiao represents that none of the five documents was either reviewed by the filter team or accessible to the prosecution team, there is no question that these five documents were produced by the prosecution to Defendants. (Defendants set forth the folder paths for each of Exhibits 15-19 at Exhibit 3.) And while the Government attempts to attribute this discrepancy to, among other possibilities, "untold numbers of purported system files and other purported duplicate files removed by automatic processes" (Opp. 15 n.6), none of the five documents is an exact duplicate of any of the other documents identified in Ms. Hsaio's

---

[9] The two declarants also differ on the composition of the filter team over time, *compare* Garner Decl. ¶ 2 *with* Hsiao Decl. ¶ 2, and the number of documents withheld from the prosecution team, *compare* Garner Decl. ¶ 6 *with* Hsiao Decl. ¶ 7.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 7**

declaration.[10]  Moreover, Ms. Hsiao's declaration provides no detail as to how the Government ensures that these so-called duplicates are shielded from the prosecution team.[11]

Although Ms. Hsiao's declaration raises more questions than answers, it does make one thing clear: the Government did not use its filter review team to identify privileged documents that should be shielded from the prosecution team.  Rather, the Government simply applied an undisclosed set of search terms to the entire universe of nearly 3 million seized documents and shielded the result of that search (approximately 91,000 documents total) from the prosecution team.  Although the filter team reviewed those 91,000 documents and made approximately 53,000 of them available to the prosecution team (presumably using some undisclosed criteria to determine, *inter alia*, when a privilege covering a communication was waived), the remaining approximately 2.95 million documents were provided to the prosecution team *without any filter review at all*.  In other words, the filter team was used not to shield privileged documents from the prosecution team, but to *increase* the number of documents accessible to the prosecution team.  The team described by Ms. Hsiao was not a "filter team" in any sense of the term; it was a "de-filter" team.

Given (1) the inconsistent and confusing manner in which the Government has described its filter process to date, (2) its use of attorney-related search terms as the *exclusive* means of filtering privileged document from the prosecution team, and (3) the fact that the filter team granted the prosecution team with access to over 50,000 documents containing the names of one

---

[10]   The Government also raises the possibility that these documents could be from Mr. Geissler's laptop computer, which "took errors during processing and were never converted into usable files." Opp. at 15 n.6. However, the folder path for at least one of the five documents indicates that the document was taken from one of Mr. Doyle's email folders.  *See* Ex. 3.

[11]   Ms. Hsiao acknowledges that she "was not involved in the collection or processing of the documents that the taint team received and was tasked with reviewing," and "ha[s] no explanation for why the taint team did not receive the specific versions of these documents." Hsiao Decl. ¶ 14.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 8**

or more of USPlabs' lawyers or law firms, the Court should order the Government to provide Defendants with all of the information regarding the filter process requested by Defendants.[12]

### D.   The Government's Frequent Communication With Plaintiffs' Attorneys and Media Outlets Is Further Justification For The Requested Relief.

Although the Government downplays its communications with plaintiffs' attorneys as routine conferrals with counsel for purported victims under the Crime Victim's Rights Act ("CVRA"),[13] that explanation is transparently disingenuous.  Section 3771(a)(5), which grants "crime victims"[14] "the *reasonable* right to confer with the attorney for the Government in the case," was intended to enable victims to form and express opinions that would allow them to communicate their views **to the court overseeing the criminal proceeding**.  *See United States v. BP Prod. N. Am. Inc.*, No. CRIM. H-07-434, 2008 WL 501321, at *14 (S.D. Tex. Feb. 21, 2008). It was never intended to permit the Government and purported crime victims' attorneys to collude on a coordinated litigation strategy in both the criminal case and pending civil litigation involving the same allegations, which appears to be what has been happening here.  Indeed, at a recent hearing in one of the civil lawsuits pending in California, Sean Higgins, an A&T attorney, assured the court, in an effort to persuade the court to lift the current stay of proceedings until resolution of the criminal proceedings, that he "ha[s] more direct communications with some of

---

[12]   This should include without limitation (1) a complete list of search terms used by the filter team, (2) the names of all attorneys involved in the filter team (and whether any of those attorneys had any involvement in the investigation and/or prosecution of Defendants, and (3) the criteria the filter team used to "de-filter" the approximately 50,000 documents to which the prosecution team was given access after search terms.

[13]   The Government's claim that the Privacy Act does not apply here is simply wrong.  The Privacy Act permits the disclosure of agency records relating to an individual via FOIA *only* where such disclosure is *required* under FOIA.  5 U.S.C. § 552a(b)(2).  And despite the Government's assertion to the contrary, DOJ appears to consider "criminal case files" as within the Executive Office of U.S. Attorneys, which includes U.S. Attorneys' Offices.  *See* DOJ SYSTEM OF RECORDS, https://www.justice.gov/opcl/doj-systems-records (last visited May 22, 2017).

[14]   As a threshold matter, the CVRA defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e).  Of course, whether the plaintiffs in question were actually "crime victims" is far from established at this point; most rights under the CVRA are exercised after crime victim status is established upon conviction.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 9**

the parties in the criminal trials" than Defendants' counsel in that case, and that, at least as he understands it, the Court's current *Daubert* motion schedule may be changing.[15]

The "context" the Government provides in defense of its treatment of A&T's FOIA request in Hawai'i is also unconvincing. A&T's FOIA request was submitted on June 15, 2015, two months prior to the submission of Mr. Herring's declaration ("Herring Declaration"). *See* Ex. 7. A&T apparently agreed to the Government's proposed *in camera* submission of the entire seizure to the court on July 15, 2015. *See* Ex. 4. If true, all of this occurred over a month before the Herring Declaration was even submitted.[16]

Of course, this all begs the question of why the *Waikiki* litigation was even on the Government's radar screen. The Government's apparent close familiarity with the activity in the *Waikiki* litigation, and its willingness to engineer an unorthodox and inappropriate FOIA response in order to help resolve that dispute in the plaintiff's favor, reveal an involvement in a purported "crime victim's" litigation that was never contemplated in the "reasonable" right to confer with government attorneys under the CVRA.[17]

---

[15] *See* Apr. 26, 2017 Hrg. Tr., *In re Little*, Case No. JCCP4808 (Cal. Sup. Ct.) (Ex. 5).

[16] There is nothing "disingenuous" (Opp. 18) about the Herring Declaration. In returning the electronic search warrant materials in late 2013, it is not true that USPlabs knew what electronic data the Government had obtained as a result of its seizure, because the Government did not indicate at that time whether it copied all or some of electronic data on the computers and hard drives it had seized.

[17] Finally, the Government's purported reason for communicating with the media strains credulity, and in any event misses the point. Its assertion that these communications were aimed a "protect[ing] the public and prevent[ing] American consumers from consuming the defendants' dangerous and/or fraudulent dietary supplements" (Opp. at 20) ignores that the fact some of these communications occurred months after Defendants pulled the allegedly "dangerous and/or fraudulent" products off of shelves. *See, e.g.*, Mot. Ex. 21. In addition, the Government was engaging the media on the purported dangers of USPlabs' OEP products at a time when internally it could not point to any scientific evidence supporting a causal link between OEP and any liver injuries. *See, e.g.*, Ex. 6. In any event, Defendants do not seek an order prohibiting the Government from communicating to the media (though they fail to see why there would be a need to do so given that all of the allegedly dangerous or fraudulent products have been off the market for years), but only one requiring the identification of any USPlabs documents that have already provided to the media, and restraining the Government's ability to share with third parties documents it has seized from USPlabs and Mr. Geissler.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER – PAGE 10**

III.     CONCLUSION

For these reasons, and those set forth in Defendants' Motion for Entry of a Protective Order, Defendants request that the Court grant their Motion in its entirety.

Dated:     May 22, 2017

Respectfully submitted:

By:

| | |
|---|---|
| /s/ Christopher Niewoehner | /s/ Richard B. Roper |
| Christopher Niewoehner (admitted *pro hac vice*)<br>Illinois Bar No. 6243575<br>Reid Weingarten (admitted *pro hac vice*)<br>Patrick F. Linehan (admitted *pro hac vice*)<br>David Fragale (admitted *pro hac vice*)<br><br>Steptoe & Johnson LLP<br>1330 Connecticut Ave. NW<br>Washington, DC  20036<br>Phone: (202) 429-3000<br>Fax: (202) 429-3902<br>rweingarten@steptoe.com<br><br>Michael John Uhl<br>Texas Bar No. 20371050<br><br>Fitzpatrick Hagood Smith & Uhl<br>2515 McKinney Ave.<br>Dallas, TX 75201<br>Phone: (214) 237-0900<br>Fax: (214) 237-0901<br>muhl@fhsulaw.com<br><br>**ATTORNEYS FOR DEFENDANT USPLABS, LLC** | Richard B. Roper<br>Texas Bar No. 01723370<br><br>Thompson & Knight LLP<br>1722 Routh Street<br>Suite 1500<br>Dallas, TX 75201<br>Phone: (214) 969-1700<br>Fax: (214) 969-1751<br><br>**ATTORNEY FOR DEFENDANT JONATHAN DOYLE** |
| /s/ S. Cass Weiland | /s/ Michael P. Gibson |
| S. Cass Weiland<br>Texas Bar No. 21081300 | Michael P. Gibson<br>Texas Bar No. 07871500 |

**Defendants' Reply in Support of Their Motion for a Protective Order – Page 11**

| | |
|---|---|
| SQUIRE PATTON BOGGS (US) LLP<br>2000 McKinney Ave.<br>Suite 1700<br>Dallas, TX 75201<br>Phone: (214) 758-1504<br>Fax: (214) 758-1550<br>Email: cass.weiland@squirepb.com<br><br>**ATTORNEY FOR DEFENDANT**<br>**MATTHEW HEBERT** | BURLESON PATE & GIBSON LLP<br>900 Jackson Street<br>Suite 330<br>Dallas, TX 75202<br>Phone: (214) 871-4900<br>Fax: (214) 871-7543<br>Email: mgibson@bp-g.com<br><br>**ATTORNEY FOR DEFENDANT**<br>**JACOBO GEISLER** |

<u>**CERTIFICATE OF SERVICE**</u>

On May 22, 2017, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the U.S. Probation Officer, all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2), and the probation officer assigned to the case.

<u>/s/ Richard B. Roper</u>
Richard B. Roper