# Exhibit 3

```
                 IN THE UNITED STATES DISTRICT COURT FOR THE
                      WESTERN DISTRICT OF VIRGINIA
                          Abingdon Division

--------------------------x
                           :
UNITED STATES OF AMERICA,  :
                           :
      Plaintiff,           :
                           :
v.                         :   1:16CR34
                           :
SITESH B. PATEL,           :
                           :
      Defendant.           :   Abingdon, Virginia
                           :   March 10, 2017
--------------------------x   9:02 a.m.
```

                PARTIAL TRANSCRIPT OF JURY TRIAL
        MOTIONS, CLOSING ARGUMENTS AND JURY INSTRUCTIONS
             BEFORE THE HONORABLE JAMES P. JONES
              UNITED STATES DISTRICT JUDGE, and a jury

<u>APPEARANCES:</u>

        S. RANDALL RAMSEYER, Esquire
        Assistant U.S. Attorney
        P.O. Box 1098
        Abingdon, Virginia 24212
            For the United States of America.

        PATRICK Q. HALL, Esquire
        1350 Columbia Street, Suite 601
        San Diego, California  92101
            and
        CHRISTOPHER K. KOWALCZUK, Esquire
        P.O. Box 11971
        Roanoke, Virginia  24022
            Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.


                    **BRIDGET A. DICKERT**
                 **UNITED STATES COURT REPORTER**
                 **180 WEST MAIN STREET, ROOM 104**
                    **ABINGDON, VIRGINIA 24210**
                       **(276) 628-5116**

1          (Proceedings commenced at 9:02 a.m.)

2              THE COURT:  Good morning, ladies and gentlemen.  Are we

3    ready for the jury?

4              MR. RAMSEYER:  Yes.  Has the court made a decision

5    about the expert witness for the defense?

6              THE COURT:  I have.  I believe it should be excluded,

7    and the reason is as follows.  Under the Collateral Matter

8    Doctrine the parties are prohibited from using extrinsic evidence

9    to contradict testimony on, on a collateral matter, and I believe

10   this is, is a collateral matter and is not, and is not relevant

11   to the issues in the case, but solely to be introduced to attack

12   the credibility of the witness.

13       In addition, I think the law is clear, certainly in the

14   Fourth Circuit, that a witness cannot be asked about questions as

15   to collateral matters just to attack his credibility.  I don't

16   remember how this came up, but in any event, I believe the

17   extrinsic evidence from this expert, who I understand's purpose

18   is to show the illegality of a certain product the witness,

19   Steven Wood, was manufacturing, and said a legal product is

20   prohibited.

21              MR. HALL:  Your Honor, not to dispute that, may I lodge

22   her *curriculum vitae* with the court indicating who it was I

23   intended to call, and also a short proffer that she would have

24   testified, in essence, that the Noopept and also the Picamilon

25   that Mr. Wood has, in the past, marketed, and was the subject of

1    the letter that was never sent by FDA, and also the Noopept, is

2    not a dietary ingredient for a proper nutritional supplement?

3              THE COURT:  Yes, sir, you may proffer that, and that

4    will be marked as an exhibit and excluded.

5              THE CLERK:  Defendant's Exhibit 77 marked.

6              THE COURT:  All right.  Are we ready for the jury,

7    then?

8              MR. RAMSEYER:  Yes, Your Honor.

9              THE COURT:  So, Mr. Patel, if you'd retake the stand, I

10   believe you're still being cross examined, and you're still under

11   oath, sir.

12       (The jury entered the courtroom and was seated in the jury

13   box.)

14             THE COURT:  Good morning, ladies and gentlemen.  We're

15   ready to go again.  You may proceed, Mr. Ramseyer.

16             MR. RAMSEYER:  Thank you, Your Honor.

17       (Proceedings were had and reported, and previously

18   transcribed.)

19             THE COURT:  Any further evidence?

20             MR. HALL:  One second, Your Honor.  Your Honor, the

21   Government and the defense have reached a stipulation that

22   Exhibits 74 and 75 were found in the search of Mr. Wood's offices

23   on September 14, 2011, and that these are the same types of

24   shipping receipts that were introduced previously.

25             THE COURT:  All right.  Do you wish to introduce those?

1            MR. HALL:  I wish to introduce them at this time, Your

2    Honor.

3            THE COURT:  All right.  They will be admitted as

4    defense exhibits?

5            MR. HALL:  Seventy-four and 75.

6            THE COURT:  All right.  They will be admitted.

7        (Defendant's Exhibit Nos. 74 and 75 were received in

8    evidence.)

9            MR. HALL:  Your Honor, at this point there would be one

10   request we may not want to do in front of the jury.

11           THE COURT:  All right.  Ladies and gentlemen, if you'll

12   follow the bailiff out, please, I need to talk to the lawyers.

13       (The jury retired to the jury room, after which the

14   following occurred:)

15           MR. HALL:  Two things before the defense rests.  We

16   would seek to call Mr. Ramseyer regarding the conversations he

17   had limiting the scope of the subpoena.  I just wanted to make my

18   record clear on that.  I don't intend to argue it.

19       The second is we would move for mistrial based on the line

20   of cross examination that is clearly based upon items that were

21   seized during the search of the S.K. Laboratories offices.  Those

22   e-mails were seized from the server, and his whole line of cross

23   examination was based upon that search.  We filed a 12(d) motion

24   previously, or the Rule 12 -- I think the section changed so I'm

25   not sure it's (d) anymore, but we changed that, we had requested

```
1    that, we never got notice of it even after they acquired it after

2    the motion.  I still believe they had an ongoing obligation to

3    tell us about that.  They clearly used it for their advantage in

4    cross examination.  So, we move for mistrial.

5             THE COURT:  All right.  Mr. Ramseyer, any response you

6    wish to make?

7             MR. RAMSEYER:  No, Your Honor.

8             THE COURT:  I will deny the motion for mistrial, and

9    deny the motion to call Mr. Ramseyer as a witness.  Before -- and

10   Mr. Ramseyer, do you have any rebuttal evidence that you wish to

11   present?

12            MR. RAMSEYER:  No, Your Honor.

13            THE COURT:  I have revised certain instructions, and

14   I'm going to give copies of those to counsel in a moment, but I

15   just want to -- or you have copies?  Yes, ma'am, if you would

16   hand those out.

17       The three changed instructions are instruction 17 which

18   relates to counts three, four and five.  The only instruction was

19   to limit it to the defendant.  The prior version of it had the,

20   had the other, had the other co-conspirators listed.  But in view

21   of Pinkerton I don't think that's necessary and maybe confusing.

22       Instruction number 20, at the request of the Government, at

23   the request of the Government at the bottom of that instruction I

24   limited it to the withdrawal defense to the Pinkerton

25   instruction, that is instruction number 20.
```

1    And then instruction number 20A is an aiding and abetting

2 instruction.  The Fourth Circuit has held, quote, "It is settled

3 that vicarious liability predicated on having aided or abetted

4 the crimes of another need not be charged in the indictment."

5 *United States* v. *Ashley*, 606 F.3d 135, Fourth Circuit (2010).

6 So, I intend to charge the jury as indicated.

7    I've also prepared a, the redacted indictment, and I'll also

8 have copies of those given to you, which just lists counts one,

9 two, three, four and five without the introduction and without

10 the forfeiture notice.  And I intend to give that to the jury

11 and, again, explain to them that it is not, the indictment is not

12 evidence.

13    So, is there anything else we need to take up?  Yes, sir?

14    MR. RAMSEYER:  Your Honor, at some point yesterday

15 there were three sheets of jury instructions that were at my

16 desk.  I think they go with jury instruction number 13.  But I

17 just want to make sure I've got the, what the judge intends to

18 present.  On the second page of instruction number 13, starts

19 with, "in which member."

20    THE COURT:  Yes.

21    MR. RAMSEYER:  And then I have two versions at the end,

22 at the end of that page, is it, "appear totally innocent and

23 legal"?

24    THE COURT:  Yes.

25    MR. RAMSEYER:  Does the court know what the

1    difference -- I'm looking at it, and don't see what the change

2    was.  Oh, I see.  It's the overt act requirement.  I understand.

3            THE COURT:  Yes, sir.  I apologize.  That was the other

4    change, I agree, as I thought I indicated earlier, that overt act

5    is not required for that conspiracy.  And we can, we can take a

6    little time if counsel needs to, look over the instructions and

7    make sure they have them straight.

8            MR. HALL:  Yes, Your Honor, if we could, make sure we

9    have the right ones.

10            THE COURT:  My law clerk, Alexis, who is assisting me,

11    can remain in the courtroom, if she can help also.

12            MR. KOWALCZUK:  Judge, if I may ask a question, in

13    terms of the number of copies of jury instructions that go back,

14    will you send more than one or just one?  Or one for each juror?

15            THE COURT:  My practice is just to send one back, but

16    I'm amenable to requests in that regard.

17            MR. HALL:  Your Honor, I --

18            THE COURT:  I mean -- let me explain.  I, of course,

19    read the instructions to the jury.  I also show them on the Elmo,

20    on their monitors so that they are seeing them, and they're being

21    read to them at the same time.

22            MR. KOWALCZUK:  Judge, if I might, I, I feel very

23    strongly that when they go back and they, obviously instructions

24    are important, and I believe that one juror has instructions and

25    is sort of taking care of reading them to the others, we learn

1  best when we are both seeing and hearing.  If it doesn't kill too

2  many trees, there's only 20 or so instructions, I would ask that

3  a set be made available to each juror.

4         THE COURT:  Yes, sir, I'll do that.

5         MR. KOWALCZUK:  Thank you, Your Honor.

6         THE COURT:  So, we'll take a minute for counsel to look

7  at the instructions, and then otherwise counsel is ready to go

8  with closing argument?

9         MR. HALL:  We are, Your Honor.

10        THE COURT:  And again, one hour each side.  The

11 Government, obviously, can divide its argument after making a

12 fair opening.

13        MR. RAMSEYER:  Your Honor, I'd tell the court, I intend

14 to have a very brief closing and very brief rebuttal.  I don't

15 think I'll take anywhere close to an hour.

16        THE COURT:  All right.  I'm sure Mr. Hall will do the

17 same.  Maybe my original 15 minutes was good.  All right.  Thank

18 you, counsel.  We'll be in recess for 15 minutes, or so.  Would

19 that be sufficient?

20    (Recess from 9:33 a.m. to 9:49 a.m.)

21        THE COURT:  Yes, sir?

22        MR. HALL:  Your Honor, I need to renew my Rule 29

23 motion, and I would ask to do so at this point.

24        THE COURT:  It will be denied.  Are we ready, then, for

25 closing arguments?

1           MR. HALL:  Yes, sir.

2           THE COURT:  All right.  We'll have the jury in.

3       (The jury entered the courtroom and was seated in the jury

4   box.)

5           THE COURT:  All right.  Ladies and gentlemen, you've

6   heard now all of the evidence in the case, and you're going to

7   hear now the closing or final arguments from the attorneys in

8   which they'll be attempting to summarize the evidence that you

9   heard.  Following that, I will give you instructions on the law

10  that you are to follow in reaching your verdict.  You will then

11  retire to the jury room to deliberate on your verdict.

12      Now, you'll first hear from Mr. Ramseyer, the Government's

13  attorney, and then you'll hear from counsel for Mr. Patel.  And

14  then finally, because the Government has the burden of proof in

15  this case, Mr. Ramseyer will get a chance to talk to you last.

16      So, if you'll listen carefully and we'll proceed.

17  Mr. Ramseyer?

18          MR. RAMSEYER:  Thank you, Your Honor.  Ladies and

19  gentlemen, I want to thank you for your time.  I know all of you

20  are probably happy this morning to have the evidence finished,

21  you can finally do your part of the case.  It's been very time

22  consuming and tedious for you, I understand that, and you've been

23  very patient.  And I know everybody here appreciates your

24  efforts.

25      But as you can tell now, after you've heard all the

1   evidence, it's a very important case that your sitting on.  And

2   it's clear that you understand the case, you get it.  I've been

3   told that I have a tendency to beat a dead horse, that I talk too

4   much, and I get too intense and too detail oriented, and I have a

5   feeling if I start going through all the exhibits again you're

6   not going to be happy with me.  So, I'm not going to do all that.

7   I'm going to take that all to heart and I'm going to be brief.

8   I'm going to be done by ten after 11:00.  So, about 15 minutes.

9           THE COURT:  Ten after ten, I guess.

10          MR. RAMSEYER:  Yes, sorry.  Fifteen minutes.  Thank

11  you.

12      First thing, at the beginning we told you what the evidence

13  would be, at the power points.  I was going to go through that

14  again, but again, you get it, I'm not going to go through it.  We

15  proved everything in there.  The evidence came out just like we

16  told you it was going to be.

17      The first thing I want to talk about, the court is going to

18  read the jury instructions to you when we finish.  He told you

19  that.  Pay attention to them.  They're very important.  If you

20  follow them you'll find the defendant guilty.

21      All the instructions are important, but the most important

22  one is the one where the court says use your reason and common

23  sense.  That's why we have juries, because they use reason and

24  common sense.  Sometimes there's a tendency to over think things.

25  You don't need to.

```
1          The one instruction I want to talk to you about other than

2    that is the withdrawal instruction.  You heard, you can kind of

3    tell from the evidence, the way the case played out, the defense

4    is going to be he got out.  They're not going to say he wasn't in

5    it because, I've got to say, the agents did a great job putting

6    the case together.  There's no doubt he was in the conspiracy.

7    The only defense they're left with is he got out.

8          Let me show you the instruction on that.  So, it says if you

9    find the defendant, Mr. Patel, has proved that he withdrew from

10   the conspiracy as charged in the indictment prior to July 26th of

11   2011 then you must find him not guilty of counts one and two.

12        I'd just remind you that Steve Wood was arrested on

13   September 14th of 2011.  It's the Government's position the

14   evidence shows Mr. Patel was still a member of the conspiracy at

15   the time Steve Wood was arrested.  To show that he withdrew, the

16   defendant must have taken some affirmative action in attempt to

17   defeat or disavow the goal of the conspiracy such as completely

18   undermining his earlier acts in support of the commission of the

19   crime so that these acts no longer could support or assist the

20   commission of the crime; or performing an affirmative act that is

21   inconsistent with the goal of the conspiracy in a way that the

22   co-conspirators are reasonably likely to know about it before

23   they carry through with the additional acts of the conspiracy; or

24   three, communicating to each of his co-conspirators that he has

25   abandoned the conspiracy and its goals.
```

1      And you heard Mr. Patel testify that even at the end he was

2  fine with them making H-Drol and M-Drol.  And as the court goes

3  on to say, merely ceasing active participation in the conspiracy

4  is not sufficient evidence of withdrawal.  And he's got the

5  burden of proving that, that he withdrew.

6      He hasn't met that burden.  He did not withdraw from the

7  conspiracy.  He was a member of the conspiracy up until

8  September 14th of 2011 when Mr. Wood was arrested.

9      So, let's very briefly review the testimony.  Steve Wood

10  testified that he was both Brian and Steve.  He's the same guy

11  that all that time was Competitive Edge Labs, Competitive Edge

12  Labs was the company that sold the H-Drol and M-Drol, he was

13  making a lot of it, and it was his biggest money maker, that the

14  labels were false because they weren't dietary supplements, he

15  knew they were drugs, he testified that H-Drol and M-Drol were

16  intended to affect the structure and function of the body and

17  they assisted in the development of muscle growth, from 2008

18  through 2011.  So, the time period of the entire conspiracy Steve

19  Wood was getting raw chemical powder from Eric Li in China.  That

20  didn't change throughout the whole conspiracy.  And in 2008 and

21  2009 Sitesh Patel was making H-Drol and M-Drol for Competitive

22  Edge Labs, paid by Competitive Edge Labs checks, in bottles that

23  looked just like those.

24      In September of 2010 Steve e-mailed Sitesh and asked him if

25  he knew anyone that could make PHs for him, pro-hormones.  All

1   those e-mails are in evidence.  I'm not going to go through them

2   line by line.  Sitesh set him up with Willy Ramos, got the first

3   shipment sent to his house, and the whole idea from the

4   beginning, from the very beginning of the conspiracy, the whole

5   idea was, excuse me, the whole idea from the beginning of this

6   part was that Sitesh was going to set them up so that Willy and

7   Steve could go forward and manufacture M-Drol and H-Drol.  That

8   was to be Sitesh's involvement in the conspiracy, setting you two

9   up, you go.  That would be enough.

10       But there's even more in this case because Sitesh ended up

11   doing a lot more than that.  He made sure everything got set up

12   right.  He made sure powder was shipped to his house, checks went

13   to his house, weighed the product, finished product, made sure it

14   was all right.  He arranged the first shipment of product sent to

15   Virginia.  Steve said that Sherrie sent checks made payable from

16   Human Tech to Sitesh Patel on a number of occasions.  Willy Ramos

17   was making the product, it was being shipped to Steve Wood, Steve

18   testified at some point after January 20th of 2011 Sitesh told

19   Steve to quit using e-mail and communicate only by phone or text

20   as to M-Drol and H-Drol products.  Steve Wood said that he had

21   Sherrie Lester send Sitesh eight to $10,000 on at least two

22   occasions.  Steve Wood said he was talking to Sitesh about the

23   H-Drol and M-Drol right up until the time he was arrested on

24   September 14th of 2011.

25       Let's look at the testimony of Ajay Patel.  He said Sitesh

1    was the one responsible for the production of the e-mails, and

2    Sitesh never told him that he had destroyed e-mails.  As a

3    result, Ajay signed a certification in 2015 saying that none of

4    the records sought by the subpoena had been destroyed.

5        Sherrie Lester, she testified that she mailed the checks

6    that are in counts three, four and five.  Counts three, four, and

7    five are mail fraud counts, and each time there's a mailing

8    that's in furtherance of the fraud scheme that's a separate

9    count.

10        The only ones that are in charge -- you heard the testimony

11    of a lot of mailings -- the only ones that are charged are the

12    ones in August.  Because of the statute of limitations, there's

13    three mailings of checks where Steve, where Sherrie Lester said

14    she mailed those checks to Human Tech in California from Danville

15    as payment for the H-Drol and M-Drol products.  And she testified

16    that she should, she sent cash to Sitesh on at least two

17    occasions and it was thousands of dollars.  She said Steve gave

18    her the cash to send.

19        Willy Ramos said he approached him in September of 2010

20    about making pro-hormones.  Sitesh introduced him via e-mail.

21    Willy Ramos started making pro-hormones.  He met Sitesh on more

22    than one occasion and gave him the powder, the labels and checks.

23    Willy encapsulated, bottled and labeled the M-Drol and H-Drol.

24        Sitesh arranged to have the first shipment up from Willy and

25    shipped to Virginia.  Willy Ramos testified that he made up

1    records when he was subpoenaed to make it look like he was

2    operating properly.

3         Willy Ramos testified there was times, there was a time when

4    Sitesh got mad about being in the middle between him and Steve.

5    And Willy testified that it was an argument between Willy and

6    Steve in August of 2011, he told Sitesh he was going to send

7    H-Drol powder he had back to Steve.  And Sitesh told him to go

8    ahead and finish the M-Drol.  Willy said he wouldn't do it until

9    he got some money.  And Willy got an $11,000 check on

10   August 31st, and that's in evidence.  The check is dated

11   August 29th.  He got it on August 31st.  He got it, deposited it.

12        After he got the money he produced another batch of the

13   M-Drol powder and shipped it to Steve after that.  He testified

14   that after Steve was arrested Sitesh contacted him and told him

15   to destroy the stuff from Steve.  And he did.  The powders and

16   the labels, he got rid of them.

17        There's one conspiracy, that went from 2008 to 2011, they

18   had the same powder from Eric Li, the same company, Competitive

19   Edge Labs, same checks paying for it, the same false label which

20   produced the same result, the production of H-Drol and M-Drol,

21   the drugs that caused injuries.

22        And Sitesh Patel was in the conspiracy in the end.  And the

23   court's instructions on what needs to be shown to prove he

24   withdrew from the conspiracy made clear he was in the conspiracy

25   at the end.  He's all but admitted to you he was in the

1  conspiracy with others to manufacture M-Drol and H-Drol.  He

2  admitted he tried to conceal his crimes by destroying records and

3  asking co-conspirators to destroy records.  He's admitted the

4  products they were manufacturing were drugs and not dietary

5  supplements.  He's admitted during, he admitted that as of 2009

6  he no longer wanted to use S.K. Labs to manufacture M-Drol

7  because he and the industry as a whole knew the ingredient was

8  illegal to manufacture.

9      He admitted that in 2010 one of the co-conspirators

10  contacted him and wanted him to again encapsulate M-Drol and

11  H-Drol.  And he admitted that in 2010 he agreed to locate someone

12  to manufacture M-Drol and H-Drol.  And he admitted that in

13  December of 2010 he introduced the manufacturer, Willy Ramos, to

14  Steve Wood, and the three individuals agreed they would

15  encapsulate, label and ship more M-Drol and H-Drol.

16      The defendant admitted he would insure a smooth beginning

17  for this new run of powder, and in doing so he accepted the

18  initial shipments of raw powder and other items.  He admitted

19  that his co-conspirator, Steve Wood, shipped raw powder, money

20  and labels to his house.  And he subsequently traveled to a mall

21  parking lot to turn over the materials to another defendant,

22  Willy Ramos.

23      Mr. Patel admitted on a second occasion he received raw

24  powder and materials, and he admitted he got paid kickback for

25  his participation in the conspiracy.  He says he received $500

1    from Willy, and two shipments of cash from Steve Wood.  He says

2    $1,500.  Willy says he paid him $7,500.  And Steve Wood and

3    Sherrie say it was at least two payments, and that the cash

4    payments were between eight and $10,000 each.

5        But in any  event, he admits he was paid.  He admitted that

6    both products, M-Drol and H-Drol, contained raw materials that

7    affected the structure and function of the body, and they

8    assisted in the development of muscle growth.  He admitted that

9    these raw materials hurt people, specifically causing liver

10   damage.  He admitted that people were, in fact, injured as a

11   result of ingesting these types of raw powders.  And when he

12   asked the question about injuries to consumers, the defendant was

13   callously indifferent.  He said, "I didn't manufactures them."

14       The defendant admitted that what he did was wrong and

15   illegal.  He is just asking you to believe him when he says he

16   wasn't in the conspiracy in August of 2011.  He's got no

17   documents to support it.  It's just him saying that.

18       The defendant, Sitesh Patel, has had his trial.  He's put on

19   his defense.  He hoped something would go wrong for the

20   Government, but it did not.  Ladies and gentlemen, we ask that

21   you find Mr. Patel guilty of all counts.  Thank you.

22            THE COURT:  Thank you, Mr. Ramseyer.  Mr. Hall?

23            MR. HALL:  Thank you, Your Honor.  Good morning, ladies

24   and gentlemen.  I would like to thank you for participating in

25   this, what I call a noble experiment.  And as you were sworn in

1   by the judge, he talked a little bit about the, about the duties

2   that jurors have.  And years, too many more than I want to admit,

3   years ago I was an avid history student, and so I kind of want to

4   go back to some time to give you some historical setting to what

5   you are doing here today.

6       And years ago our forefathers, as they came across from

7   Europe and were escaping tyranny in Europe, they came to the

8   United States and they had this noble dream of democracy, a

9   Constitution with checks and balances, and the heritage that they

10  were escaping from was, was sometimes a brutal heritage where the

11  king, at the king's whim would grab a citizen and throw them in

12  jail.  They had no right to a trial.  There was no jury to

13  protect them.  And they would, they would languish in jail with

14  no rights whatsoever.  Ironically, in reading history, it's sad

15  but also sometimes amusing the kings would even hang the person's

16  horse back in the old days.

17      And so when our forefathers came to the United States they

18  said that's not right, and we need to create a system where there

19  is a check on the king, there's a check on the king's men.  And

20  ladies and gentlemen, you are that check.  You are the check and

21  balance that our forefathers created, and so we talk about

22  constitutional law, we talk about the Bill of Rights, and the

23  amendments, but you are actually in that Constitution, you are

24  the people who are the check on the king's men.  And I say that

25  because it's important that as you sit there you recognize your

1   historical responsibility as I talk about some of the facts of

2   this case.

3        In his opening statement, not the closing that you just

4   heard, Mr. Ramseyer made a big deal about missing e-mails, and

5   how there was production by S.K. Labs, and how the production

6   didn't produce all the records, and he didn't produce any

7   e-mails.  And what he didn't tell you about --

8            MR. RAMSEYER:  Your Honor, I object.  That's not what I

9   said.  He knows there were multiple productions, and by the end

10  when Mr. Patel testified, Ajay Patel testified that all the

11  e-mails concerning H-Drol and M-Drol were supposed to be

12  produced, and that's what Sitesh said.

13           MR. HALL:  I'll just let the jury recall.

14           THE COURT:  Ladies and gentlemen, you're the judge of

15  the evidence in this case, and it's your, your determination of

16  the evidence that's important.  Go ahead, Mr. Hall.

17           MR. HALL:  Thank you.  And so you use your

18  recollection, not my recollection.  You use what you remember he

19  said, not what he said then, or what I'm saying.  You use what

20  you remember.  That's what the judge has instructed you and

21  that's what I'm encouraging you to do.

22       But what he didn't tell you in that opening statement was

23  that he sent an e-mail, and he sent an e-mail to counsel that was

24  forwarded in -- can we get one through five blown up, please?

25  And what the e-mail did was it placed the limitation on that

1    production, and it limited it to billing invoices, receipts for

2    payments, certificates of analysis, lab reports, any labels --

3    I'm giving you the short version.  But there's nothing about

4    e-mails in there.

5         That's important because what the Government wants you to,

6    to believe is that Mr. Patel has, has engaged in some type of

7    obfuscation or destruction of evidence since he decided to get

8    out of this case.  All right?  And so what he didn't also tell

9    you about are the phone calls he had further limiting

10   productions.  So there were two, three, there was a final

11   production in 2015.

12        He also left out, he also left out a couple of exhibits in

13   his presentation to you, and these exhibits are important.

14   Because they're the exact same kind of shipping receipts that you

15   saw when Sherrie Lester was on the stand.  But these are for the

16   dates of, see up in the corner there, July 20, 2011, right,

17   headed to Oceanside, California.  We know Oceanside is where

18   Willy Ramos was.  And here's another one, it's hard to see

19   through that, but I think you can see that.  You're going to get

20   these exhibits back, I believe, in the jury room so you can look

21   at that.  That says July 11, 2011.  These are the same amounts,

22   $18, 30 cents, these are the same type of shipping records that

23   Ms. Lester testified she sent checks in August to Willy Ramos in

24   Oceanside, except she couldn't remember what his address is, if

25   you remember her testimony.

1     And so we have one of them up that said Human Tech, one of

2   them was a Human Tech address, but Willy testified that he was in

3   Oceanside; Sitesh Patel was not in Oceanside.  So, he left these

4   out, and it's important for you in your historical perspective to

5   remember that you are the check on the king's men.

6     I think I ended my opening statement with a quote from

7   Hebrews 10, "And the lord said their sins and lawless acts I will

8   remember no more."  And I quoted that because the Bible

9   recognizes that in certain circumstances there's forgiveness, and

10   the law also recognizes that there are certain circumstances that

11   there should be forgiveness.

12     And what I want you to focus on today are some of these

13   instructions that Mr. Ramseyer talked a little bit about it, but

14   I want to go through that a little bit further because, you know,

15   we've all gone to law school, and we all learned to talk in a

16   certain manner, and as I sit down.  As I read jury instructions I

17   candidly think sometimes they're very confusing.  So I'm going to

18   try and simplify things for you because there are two

19   instructions that I want you to focus on.  Not ignore the

20   evidence in the case, but there are two real instructions that

21   are important in his case.

22     Can we get instruction 16 up, please?  And blow up that

23   first paragraph.  It says the same thing that Mr. Ramseyer read

24   to you, but it says, "The defendant cannot be found guilty of a

25   conspiracy charge if he withdrew from the conspiracy more than

1    five years before the indictment was returned.  The indictment in

2    this case was returned on July 26, 2016.  If you find that

3    defendant, Mr. Patel, has proved that he withdrew from the

4    conspiracy charged in the indictment prior to July 26, 2011, then

5    you must find him not guilty of counts one and two."  All right.

6    And so that's the law.  All right.

7         But what does it mean to withdraw from a conspiracy?  What

8    do you have to do to demonstrate that you have withdrawn from the

9    conspiracy?  So, if we can go to the next one.  Can we blow up

10   that whole bottom half of the page, please?  In order to withdraw

11   the defendant must have taken some affirmative act in an attempt

12   to defeat or disavow the goals of the conspiracy, such as -- so,

13   that doesn't mean that he has to call the police.  That would

14   clearly be an act trying to defeat, but this is in the

15   disjunctive, this is an and/or question, we all learned the

16   differences between and and or in school, this is an and/or

17   proposition, so, if Mr. Patel disavowed the goals of the

18   conspiracy, then that is evidence of his withdrawal from the

19   conspiracy.  And you can take that disavowal as a withdrawal from

20   the conspiracy.

21        And so how does he have to, how does he have to disavow his

22   involvement in the conspiracy?  And so there are three

23   propositions there, all right, completely undermining, and

24   frankly, you should look at all of them, but what I'm going to

25   focus on is number three, because that's what this case is all

1    about, communicating to each of his co-conspirators that he has

2    abandoned the goal, has abandoned the conspiracy and its goals.

3         That's what happened in this case.  And let's be clear, that

4    does not tell you that he can't ever talk again to Mr. Ramos, or

5    that he can't ever talk again to Steve Wood; it tells you that he

6    has to communicate he's abandoned the conspiracy and its goals,

7    and that's exactly what's Sitesh Patel did in April of 2011.

8         It doesn't require that he call the police, doesn't require

9    that he hide from him, doesn't require that he never, ever talk

10   to him again; it simply says that he must communicate his

11   abandonment of the conspiracy and the goals, and that's what he

12   did.

13        There are -- you can take that down.  There's one other jury

14   instruction that I would like you to look at.  If we could get

15   jury instruction 20, please.  Go to the last paragraph.  And this

16   is, this is the instruction as to counts two, three and four.

17   That first instruction was counts one and two, the two conspiracy

18   charges, and this is the instruction as to counts three, four and

19   five.  "If, after considering all the evidence, you believe the

20   defendant has proved that he had withdrawn from the conspiracy

21   before his co-conspirators committed the charged mail fraud

22   offenses as contained in counts three, four and five, you cannot

23   find the defendant guilty on the basis described in this

24   instruction."  Thank you.

25        And so what that means is that if you find that he withdrew

1    from the conspiracy, the conspiracy charged in counts one or two,

2    then you, then you acquit him on counts three, four and five.

3         So, we go back to, to instruction 16, to the second page,

4    and so a withdrawal from the conspiracy is kind of an unusual

5    thing.  All of you who came in here had this, this concept of

6    reasonable doubt, this was going to be a case about proof beyond

7    a reasonable doubt.  But when we're talking about withdrawal from

8    a conspiracy, that changes.  And what we're talking about is

9    whether the defendant withdrew from the conspiracy and the

10   defendant must prove that by a preponderance of the evidence.

11        And so I don't believe any of you had served on prior jury

12   duty before.  That's like in a civil case standard, that's not

13   proof beyond a reasonable doubt; that's preponderance.  So, to

14   give you some example, some people talk about a scale, and if the

15   scale is exactly even, 50/50, but if it weighs just a little bit,

16   it leans a little to one side, all right, that's a preponderance

17   of the evidence.  It's not beyond a reasonable doubt; it's

18   preponderance of the evidence.

19        A better example, I'm a football fan -- Mr. Brewer, as I

20   recall you played football in high school -- I think the better

21   example is the ball is on the 50-yard line, and to show your case

22   by a preponderance of the evidence you don't have to score a

23   touchdown, you don't even have to get a first down; you have to

24   move the ball to the 49-yard line.  And I think that's what we're

25   talking about in terms of the evidence in this case.  That's all

1    that has to be shown, that we moved the ball to the 49-yard line.

2    And so that's, that's set in this paragraph talking about the

3    defendant's burden.

4         So, can we blow up lines three through 13?  So, here we're

5    talking about reasonable doubt.  It says, "The defendant has the

6    burden of proving withdrawal from the conspiracy by a

7    preponderance of the evidence.  To prove something by a

8    preponderance of the evidence means to prove that it is more

9    likely than not."  Forty-nine yard line, a lesser burden of proof

10   than to prove something beyond a reasonable doubt.  Or this is a

11   lesser burden of proof.

12        And you should consider all the evidence.  You should use

13   all of your common sense.  And so I want to move on and start

14   talking a little bit about what the evidence is and start talking

15   about why we moved the ball past the 49-yard line in this case.

16   Two side issues.  Side shows, as I call them.  One of them is --

17   you can take that down, please.  One of them is Mr. Ramseyer had

18   the checks up with Bansi Patel, that Ramos had gone back and

19   purchased flavors back in later times in 2011, he purchased the

20   flavor from Bansi Patel.  And Bansi, or he purchased it from

21   Sitesh Patel, the checks had been left blank in the name of Bansi

22   Patel, and he goes and he cashes them.  That doesn't prove any

23   involvement in the conspiracy, and that has nothing to do with

24   withdrawal from the conspiracy.  That's just the nature of the

25   business between Mr. Ramos and Mr. Sitesh Patel.  And so the fact

 1   that he gave them checks is not, has nothing to do with this.

 2        I suspect that Mr. Ramseyer is going to argue, look, they're

 3   still having contact.  But again, still having contact doesn't

 4   mean that a person hasn't withdrawn from the conspiracy.  He had

 5   to have communicated his withdrawal from that.  And candidly,

 6   Mr. Ramos testified that he did.  He told him he wanted to stop.

 7        The second issue I want to talk about, or you heard some

 8   little bit last night, and a little this morning about COAs,

 9   certificates of analysis.  And a certificate of analysis is a

10   chemical description of something that comes into the, into the

11   company.  And I think Mr. Ramseyer portrays Mr. Patel as not

12   really caring about them, and he talked about doctoring up a COA.

13   And that's, first of all, that's not the issue in this case, but

14   let me explain to you what a COA is.

15        And I think you heard the testimony from Mr. Patel, a

16   certificate of analysis comes in from China sometimes, and, and

17   it's just wrong.  And so you get something, and it's wrong.  What

18   do you do with it?  Do you alter it, do you fix it, do you change

19   it?  You need to get it changed because it's important that

20   everyone know that whatever that powder is is really what that

21   powder is.  And that's just not important at S.K. anymore because

22   remember he talked about the FTIR machine, and I talked to you

23   about it in my opening statement, we had a picture up there about

24   what it is, and that FTIR machine is an internal machine at S.K.

25   Laboratories that was in existence, I believe the testimony was,

```
 1   from 2009 where they internally test the product.  What that
 2   means is when something comes in the door they test it.  And
 3   there was even an e-mail where Sitesh is asking Steve Wood, you
 4   know, can I get, can I get a one gram sample of e-STANE because
 5   we want to put it in the FTIR machine, and the response from Wood
 6   was LOL, you've got all we have, or something to that effect.
 7   You guys can read the e-mails.  All of that is in evidence.  I'm
 8   not going to bring those up here today.  I'm going to point out
 9   certain things in the evidence, but I do want you to look at all
10   of those.
11        And so it's not important, and this phrase about doctored
12   COAs is not what the issue is in this case.  The issue is, in
13   this case is whether Sitesh Patel withdrew from the conspiracy.
14   And the real issue is who is telling the truth?  Is it Willy
15   Ramos, Steve Wood, or is it Sitesh Patel?  And you sit as the
16   final, the final check on the king's men in determining who is
17   telling the truth.
18        And in this instance I'd like to talk a little bit about
19   Willy Ramos.  The idea that Ramos, before his grand jury
20   appearance, came in and he was asking him some questions about
21   how long did it take you to make those records, we didn't put
22   them all up on the screen, but it's a big stack of records, and
23   when you look through it, it took some time to prepare these,
24   and, and we were having this discussion, and I think the judge
25   asked him a question, it took you two days, and he said no, it
```

1   took me longer, it took me a few days to create all of these

2   phony records that I took in front of the grand jury.

3       And it's not just that he made up a bunch of phony records,

4   ladies and gentlemen, he took them in front of the grand jury, he

5   swore to tell the truth, he said these are legitimate records,

6   and he committed perjury.  So, it's not just a matter of this is,

7   I just made up some records.  He perjured himself in front of the

8   grand jury.  And interestingly, he's got a plea agreement in this

9   case where he pled guilty to a charge in this count, but there's

10  nothing said about the fact that he's not getting charged for his

11  perjury in front of the grand jury in 2013.

12      And so, you know, sometimes people would say you should, you

13  should, you know, go through the testimony and scrutinize it and

14  pick out the parts of the testimony that you want to believe, and

15  you don't have to believe all of it, you can believe some of it,

16  you don't have to believe all of it and, you know, and I always

17  think of this, it's kind of a slightly, people have told me it's

18  a slightly disgusting story, but I've had an, but you've had an

19  occasion where you go to the store and you grab a candy bar, you

20  open up the candy bar and you start to eat it, and take a bite,

21  and then you look, and sure enough there's a larva or a maggot on

22  the inside of the wrapping of the candy bar.  I hope none of you

23  have had that experience.  It was not a pleasant experience.  And

24  so when that happened to me, it was a situation where I was like,

25  well, you know, there's a maggot on it, you know.  Am I going to

1   eat around the candy bar, around the part the maggot is on and

2   eat that candy bar, or am I just going to throw that candy bar

3   away?  I would suggest to you that's the type of analysis that

4   you should use with respect to the Willy Ramos and Steve Wood

5   testimony.  Are you going to pick through it, or should you

6   disregard, discard the whole candy bar and throw it away.

7       Mr. Ramseyer suggested that Willy Ramos and Steve Wood are

8   our choices of witnesses.  And that's just not true.  We're not

9   picking them, we're not putting them up there, we're not telling

10  you that they're telling the truth.  Mr. Ramseyer is.  And so,

11  you know, at one point it's important in evaluating a person's

12  testimony to listen to what they were saying in response to some

13  of the questions, and near the end of the cross examination

14  Mr. Ramos kept repeating, "I'm here to tell the truth.  I'm here

15  to tell the truth.  I'm here to tell the truth."  And no matter

16  what my question was, he was saying, "I'm here to tell the

17  truth."  And it was like he was rehearsing his line from his

18  movies.  His story changed, and that's another thing that you

19  should take into consideration when evaluating a person's

20  testimony.

21      So, you've heard when he first testified on direct

22  examination he said that he got three or four payments, and then

23  on cross examination he changed it.  Well, maybe it was two or

24  three payments.  And then when we finally heard from Agent

25  Royster about what he really said when he first came in, he said

1    it was two payments.  And that's what Sitesh Patel said, two

2    payments.  That's what's important, is that what he told the

3    agents the very first time.  He claimed, Ramos claimed that

4    Sitesh told him after the arrest, after Wood had been arrested,

5    in that he told him, he told him Steve Wood had been arrested and

6    he needed to destroy all his records.  He needed to destroy not

7    his records; destroy all his powders is what he said.  You heard

8    Mr. Patel testify that didn't happen.  So, you have to resolve

9    this conflict in the testimony.

10        And so here's my question in resolving that.  You heard

11   Mr. Ramseyer refer again to the fact that Willy made a last

12   shipment, and he sent it off, and he didn't get paid.  So, if he

13   made a last shipment, and he sent it off, what powder is there to

14   destroy?  What did he have left?

15        More importantly, Willy Ramos didn't say that he was talking

16   to Sitesh Patel during this time frame about what powders he had.

17   There was no testimony about that.  Mr. Patel's testimony was he

18   wasn't talking to him at that time frame about it.  And so how

19   would Mr. Patel know that he had it in powder form?  And if he

20   had a last shipment, where did it go?  Because we heard on

21   September 11th, or September 14th of 2011 the agents went into

22   Steve Wood's offices and they seized everything, and you can be

23   sure that if they had seized a big shipment that they had just

24   received from Willy Ramos, then there would have been testimony

25   regarding that, and there wasn't any such testimony.

1   And they would have had a bottle that was manufactured by

2   Willy Ramos.  Remember when he got up and looked at the two

3   bottles?  He said one of them looks like one I could have made

4   but this one isn't one because it has a different kind of seal on

5   it.  So, it's not even the same type of bottle.  So, they didn't

6   get any shipments.

7   And so that's important because Sitesh Patel said that

8   telephone call never happened.  And so if you're sitting here,

9   and you're weighing, okay, how do I determine whether, who is

10  telling the truth and who is not telling the truth, you use your

11  common sense in analyzing these things.  You think about what

12  things there could be that could corroborate it one way or the

13  other, any phone call records suggesting Mr. Patel called Willy

14  Ramos.  We all know that the Government, if they wanted to, can

15  get your phone records.  There's no evidence of that.

16  And so I would submit to you that just analyzing that

17  situation, ladies and gentlemen, you should be leaning toward

18  Mr. Patel on that scale of the football field, you should be

19  leaning toward Mr. Patel.

20  But there was one thing that Mr. Ramos said that was most

21  significant, and he said that Sitesh Patel told him he wanted to

22  stop.  And I can't paraphrase the exact words for you, you have

23  to use your recollection as to what he said, but Ramos said that

24  Patel said he wanted to stop, and he said he wanted to stop after

25  he went to Texas to pick up a delivery of powders in Texas, which

1   were in March, and that's what Willy Ramos said, that Mr. Patel

2   told him that he wanted to stop in March, or right after that

3   March pick up in Texas.

4        And that's significant, ladies and gentlemen, because that's

5   exactly what Sitesh Patel said.  He said he told him he didn't

6   want to be involved.  He told them he wanted to stop.  He told

7   them he didn't want any more payments, and he didn't get any more

8   payments from Willy Ramos.  And the fact that he talks about not

9   getting any more payments confirms that Mr. Patel withdrew from

10  the conspiracy.  That fact, alone, if we're still using this

11  football analysis, all right, that fact isn't just moving the

12  ball a yard; that's a first down.  The Government's witness said

13  he withdrew from the conspiracy.  He said he wanted to stop.

14       Let me talk about Sitesh Patel for a minute.  He's not an

15  actor.  When he got up here and he bears his sole to you, and he

16  talked to you, and he candidly admitted what he had done, and

17  when he had done it.  And it's important for you to understand

18  the credibility here.  In evaluating the credibility, because

19  you've got to do that, that's what your job is here, who is

20  telling the truth?  So, under the skilled cross examination by

21  Mr. Ramseyer, all right, he stood up there, but he didn't catch

22  him in any kind of lies.  He didn't catch him in any kind of

23  prior inconsistent statements.  He answered him.  He answered all

24  of his questions, and he admitted a lot of things that he had

25  done that candidly, as he sits here today, he clearly regrets

1    having gotten involved in this.  And that's a factor that you can

2    use in evaluating a person's credibility.  How did they answer

3    the questions?  Did they answer them directly or did they duck

4    them?  Did they artfully dodge them, go around, and perhaps I

5    tested your patience a little too much with my cross examination

6    of Steve Wood, but then, but that exercise was intended by me at

7    least to show you that Steve Wood was ducking the questions, kept

8    asking the same question again and again.  All right.  And I

9    think, I think I, candidly, think I tested the judge's patience a

10   bit.  But I don't think he was answering the questions.  He was

11   saying what he wanted to say, but he really wasn't answering the

12   questions.  That's one of the signs, that's one of the signs a

13   person is lying, and not telling the truth.  They're not directly

14   answering your questions.

15       So, when Mr. Patel testified, what is it that he said that

16   rang true?  And what is it that was confirmed by evidence in this

17   case?  He said that he had a February 3, 2011 telephone call with

18   Steve Wood, and in that telephone call he said, "Don't send me

19   the powders anymore."  And what happened?  None of the powders

20   went to him anymore.

21       Willy Ramos talked about two deliveries.  I think those both

22   happened in December, the end of December.  But there were no

23   more deliveries of powders.  There aren't any shipping records

24   that reflect that the payments were going to him.  You have the

25   e-mail in which Steve Wood calls him, or e-mails him and says

1    "Hey, I need to talk to you.  It's important.  Can we talk?"

2        And you have some physical evidence, you have some e-mails

3    about the whole time line of this case.  And the time line is

4    look, on June 23, 2008, we know that because there's an e-mail

5    talking about it, that's the first contact, that's the first

6    reach out by Brian to Sitesh Patel.  And from that period we have

7    the last invoices that you will see as exhibits.  We pointed

8    those out.  You get to look at those again.  I'm not going to go

9    through that again.  But you know that continued until May, 2009

10   and then it stopped.  And then Brian drops off the face of the

11   earth, and there is nothing that happens from May of 2009 until

12   this phone call from Steve in December of 2010.

13       So, there's an 18, more than an 18 month gap where nothing

14   happens, whatsoever, no pro-hormones, no discussion, nothing

15   happens.  And then in December there's a telephone call.  And,

16   and it's important to go back and reflect upon the testimony of

17   Agent Royster about really what the substance of that phone call

18   was.  Mr. Wood was, in my opinion, ducking my questions, again,

19   about it, but it was clear from at least his initial statements

20   to the agents about some of the things that had happened that he

21   said that S.K. had stopped, they didn't want to be involved, and

22   that the whole reason why Willy Ramos came into the picture was

23   because Patel told him that he would not make pro-hormones for

24   him any more at S.K. Laboratories.  And that's what happened.

25   That's what Sitesh Patel told you.  He said he got the phone call

1   from Steve Wood, and he asked him, "Will you make pro-hormones?"

2   And he said, "No, S.K. is not going to become involved in that."

3   And unfortunately, after that, you know, because Steve Wood was a

4   good customer, and I think under Mr. Patel's own admission here,

5   I don't think he's so proud of it, is that because of money,

6   because Steve Wood was an important client, he was doing a lot of

7   business with him, we saw that check for $64,000 a few days later

8   to the company, you know, he tried to help him out, he tried to

9   find him somebody, and he found Willy Ramos for him.  There's no

10  dispute about that.

11       So, I guess the next, the dispute comes in what happens in

12  April of 2011.  And Mr. Patel testified that he was annoyed

13  getting a telephone call, and that we know that another check was

14  sent to him because Steve Wood was having a dispute with Willy

15  Ramos.

16       Now, remember the checks had stopped going to him for a

17  period of time, right?  And then they started coming back to him.

18  And that's the dispute.  That's the dispute that Willy Ramos and

19  Steve Wood are now all saying happened in August because that's

20  within the statute of limitations, all right?  But that dispute

21  actually happened in April.  And how do we know it happened in

22  April?  Because we have the documentary evidence.  You don't have

23  to, you don't have to believe anybody, all right?  You've got

24  documentary evidence that you can look at when you go in there.

25  There's a check, and so we went through the e-mails April 22nd,

1   there was a handwritten note from Sherrie Lester, and God bless

2   Sherrie Lester, she was the, you know, she got dragged into this

3   by her childhood friend, this was a horrible experience for her,

4   she came in here, and did the best she could to testify about

5   these events, don't think it was a pleasant experience for her,

6   but she talked about what happened, and she identified these

7   receipts, she identified the handwritten notes.

8       Remember the exercise where Mr. Ramseyer was matching up the

9   check and the handwritten note.  Well, go back and look at the

10  date.  It's April 22, 2011.  And Sherrie Lester testified that

11  that's the check that she sent to Sitesh.  And sure enough,

12  there's a handwritten note that went to Sitesh.

13      Well, if there wasn't a dispute going on, why is this check

14  now going to Sitesh?  That's the dispute that they're talking

15  about.  That's the physical evidence.  And so that check went in

16  April, and it corroborates what Mr. Patel has been telling you,

17  that in April he said, "I don't want to be involved in this

18  anymore."

19      That's not the only document that corroborates what we're

20  talking about.  We have the checks from July 20th, I showed you

21  the receipts today, I want you to go back and match those up.

22  There's a whole series of checks.  There's the July 11th check,

23  there's a July 20th check, and there are three checks that go out

24  in August, the 11th, I think it's the 11th, 29th, three cashiers

25  checks, and every one of those checks matches up with the Post

1    Office receipt for about $18 delivering it first class mail, or

2    overnight mail, and it's all going to Oceanside.  None of the

3    checks are going to Sitesh Patel anymore.

4        And so if Wood is telling the truth, and Patel is, you know,

5    intervening for him, and there's a dispute in August, why do

6    three checks go out bang, bang, bang like clockwork?

7        Okay, look at those receipts.  There are three separate

8    mailings.  There wasn't a dispute in August.  The dispute was in

9    April when Mr. Patel said it was, and it's confirmed by the

10   physical evidence in this case.

11       And that, ladies and gentlemen, pushes the ball forward.

12   I'm not up here to tell you that Sitesh Patel is a saint.  We

13   know otherwise.  I don't think he's proud of what he did.  I

14   think he's ashamed of himself.  He had to get up here and testify

15   in front of his mom and dad who have been here supporting him,

16   but there came a time when he recognized that he shouldn't be

17   involved in this anymore, and he stopped.

18       I'm certainly not perfect.  I've made bad decisions in my

19   life.  I hate to impugn integrity, but I think probably all of us

20   can admit that they made some bad decisions, and try to move on

21   from them, and rectify it, and do the right thing.  That's what

22   Sitesh Patel did.  That's what Sitesh did when he said, "Okay, I

23   don't want to be involved anymore."  And so when he called Steve

24   Wood in April of 2011 it wasn't just e-mails, "Come on, I need

25   you to delete your e-mails; I'm going to delete mine."  No, it

1    was, "I'm done."  Use your common sense to think about what that

2    conversation was about.  Mr. Patel told you what it was about,

3    and that's common sense.

4         Steve Wood would have you believe no one just talked about,

5    "No, we just talked about deletes e-mails, and after that we just

6    talked by phone or text message."  There's no evidence of that,

7    by the way.  And that's just Steve Wood telling you some things.

8    Common sense tells you that there was something discussed in that

9    telephone call, and it wasn't just the e-mails; it's, "I'm done.

10   I don't want to be involved in this anymore, I want you to delete

11   your e-mails, and I'm going to delete my e-mails.  I'm done."

12        He didn't delete his e-mails from '08 and '09.  I showed you

13   some of those.  Those are still out there.  He deleted his

14   e-mails with Steve Wood because he had gotten this phone call at

15   the wedding, he was annoyed, he was dragged back into the middle

16   of it even after he stopped it on February 3rd, or he thought he

17   stopped it, and now he's a middle man, and he's arbitrating

18   between Willy and Steve about who is going to get paid.  And he's

19   had it.

20        And he goes on the internet, and he looks, and he starts

21   seeing some things.  He sees there's this recall notice which is

22   March 29th of 2011 when they're recalling this stuff that Patel

23   is thinking, Mr. Patel is thinking, "Oh, my goodness.  That's

24   what they were doing, and at the same time I'm looking on the

25   internet, and they're claiming they're recalling it."

1    Then he does a little further digging, and he comes up with,

2    I call them blogs, but they're posts, Mr. Wood corrected me,

3    where the year before in January of 2010 Steve Wood is claiming

4    that we've discontinued the manufacture of this anymore.

5    By the way, that's the lie that he told to Agent Royster

6    when he met with him in September of 2011.  And looking at all of

7    this Sitesh says, "Well, this is just, this is too much.  I can't

8    be involved in this.  What am I doing?"

9    And it's important that in this time line of events that you

10   think about what was happening in April of 2011.  His dad had

11   finally promoted him to being the vice president of the company,

12   and that's a big thing for him.  All right?  He started out,

13   remember, this is a guy that was pretty humbled by not passing

14   the board exam three times, and having to struggle, taking two

15   years to study and finally pass that, and now he's promoted to

16   the vice president in April of 2011.  That's a big deal to him.

17   They're moving to this new facility.  You've got all the

18   photographs to look at about how they do things, what they're

19   doing now, how many employees they have, what they're doing, but

20   that's a big deal.  All that is going through his head at the

21   same time he's thinking about, "What am I involved in?  Why, this

22   is wrong, I shouldn't be involved in this.  I've gotten myself

23   back into the same spot that I was back in 2008, 2009."  And he

24   says, "I'm done."

25   I have to go back for a second and talk about the testimony

1    about the two payments.  Because Wood claims that there were

2    payments all along, and Ramos's testimony changed even in front

3    of you.  Wood claimed that two payments were, that he was getting

4    paid all along.  And the significance of his first statements to

5    the agents talking about that it was two payments was

6    corroborated by Sherrie Lester who said that she thought it was a

7    couple of payments.  She said she thought it was thousands.  She

8    didn't know.  I mean, she was used, childhood friend of Steve

9    Wood, he used her in the worst fashion to run errands for him,

10   put the bank account things in her name, ultimately she's

11   horrified, she gets detained on September 14th.  What kind of

12   person does that to their childhood friend?  What kind of person

13   does that to somebody?  I think that gives you some insight into

14   who Steve Wood was.

15       And so let me, let me talk to you about Steve Wood.  You

16   were all probably hoping that chart would disappear, but it's

17   kind of important.  I did this talking to Mr. Wood, but this

18   gives you a sense of who he is.  He lied to some employees, he

19   lied to Sherrie Lester.  He lied to his retailers about who he

20   was.  He lied to his customers about who he was.  He admitted he

21   lied to Agent Royster about what was going on.  He admitted he

22   lied to Sitesh Patel about it.  He lied to the people in the on

23   line discussion at BB dot com.  And ladies and gentlemen, I'm

24   going to add one more to that.  Because when he was up here he

25   lied to you.  How do we know he lied to you?  We went through

```
 1   this very quickly yesterday.  He got on the stand, and he's still

 2   talking about the payments.  He said, "I never paid Sitesh Patel

 3   for doing standard operating procedures."  SOPs is what they're

 4   called.  I'm going to go with that abbreviation.  "He never paid

 5   me for that," or, "He never did them for me, all right?  And I

 6   never paid him for it."  I showed him the e-mail.  He said, "No,

 7   no, that's for M-Drol; that's for H-Drol.  But he, all he did was

 8   send me copies of what they had.  He didn't really do it."

 9        Well, you have in evidence, ladies and gentlemen, that he

10   did do the standard operating procedures.  There are the e-mails,

11   and there are the standard operating procedures that were the

12   attachments to the e-mail that Sitesh Patel sent to Steve Wood.

13   And so when he got there in front of you, and said no, that

14   didn't happen, he lied to you.

15        That's not the only instance he lied to you.  He lied to you

16   on multiple occasions.  And the nature of his lies are

17   particularly important.  I think the one, well, I'm obviously

18   offended by the lies he's told about Sitesh Patel, but you don't

19   have to like Sitesh Patel one way or the other.  Let's listen to

20   the lie, again, that he told about Sherrie Lester.  He and

21   Sherrie Lester made a joint decision to create MKZ, Inc. and she

22   handled all the documents to create this company.  Lester

23   presented this opportunity in South America to him, and he should

24   have said no, but he went along with this proposal.  Do you

25   remember Sherrie Lester's face when I asked her, "Did you present
```

1    an opportunity to him?"  She was flabbergasted.  She said,

2    "absolutely not.  That didn't happen."

3        What's significant is the nature of this lie is minimizing

4    what Steve Wood did, and exaggerating what other people did.  And

5    that's exactly what he's continuing to do in this case.  He lies

6    to help himself.  And he's lied, he's lied so much, and honestly

7    I think he's kind of snowed, snowed the Government to some

8    extent.

9        I think he's snowed Agent Royster.  Remember the incident up

10   on the witness stand, and I was right next to Agent Royster, and

11   we were going through the statements, and we were talking about

12   the two payments, and I was questioning him about the two

13   payments, and Agent Royster said something about, well, those are

14   the occasions, you know, that he admitted, but there must have

15   been other times when Sherrie Lester was making payments that he

16   didn't know about.

17       Do you think for a second that Sherrie Lester was sending

18   payments to Sitesh Patel on her own?  Do you think for a second

19   that Steve Wood didn't tell her everything that she was supposed

20   to do?  Do you think she was sending a penny in the mail without

21   Steve Wood knowing about it?  That's how we know that there are

22   two payments.  Steve Wood lies to everybody.  He lied about his

23   cars in front of the you.  Remember, he said, I asked him, "You

24   had seven cars," he said, "No, no, those must be old cars, those

25   must be two cars," and then we presented a copy of the

1    pre-sentence report to him, and then he said, "Oh, yeah, seven

2    cars."  He doesn't want you to know the truth.

3        He denied he had $1,000,000.  We heard the statement again

4    from Agent Royster where he said what he did with the million

5    dollars, and we heard about his lifestyle, all right, and some

6    insight into the character of who Steve Wood really was.  And we

7    heard about $256,000 in his car on the day of the arrest, and

8    $311,000 in those bank accounts that Sherrie Lester led the

9    detectives to and helped him get.

10       And so as you sit here you're wondering so, why is, why

11   would Steve Wood lie about Sitesh Patel?  And let me answer that

12   for you.  You saw the e-mails where he still owes a debt, and he

13   acknowledges that he hasn't made any payments to S.K.

14   Laboratories, he owes them over $100,000.  He hasn't made any

15   payments since May of 2014.  And so he clearly doesn't plan to

16   pay that.  That has nothing to do with M-Drol or H-Drol; that has

17   to do with legitimate business that they continued to do.  And

18   he's trying to shirk it and get out of it.

19       So, does he have a motive to lie about Sitesh Patel?  He has

20   114,000 reasons to lie about Sitesh Patel.  But he also has, I

21   want you to understand why Government witnesses get up there and

22   they tell these stories, Mr. Ramos and Mr. Wood, and why they try

23   and be gracious to the prosecutor when the prosecutor gets up

24   there.  Because you heard a little bit about motions to reduce

25   sentences, and they call the phrase substantial assistance, and

1   what substantial assistance means is that, look, if you help the

2   Government then you can get a reduced sentence.  And so if he's

3   helping the Government, he's telling the Government's view of

4   what the truth is, Mr. Ramseyer's truth, what Mr. Ramseyer wants

5   to hear, then his sentence potentially can be reduced.

6        So, Willy Ramos was facing time, Steve Wood was facing three

7   years in federal prison, and he talked himself into no time.  I

8   think he continued to lie to you about that, about what he's

9   trying to do today.  I think he still has the federal government

10  snowed to some extent about all of that.

11       And so what this case boils down to is who do you believe?

12  Do you believe Sitesh Patel?  How did he testify in this case?

13  Was he evasive?  Was he impeached with inconsistent statements?

14  Had he lied on prior occasions in comparison to Willy Ramos and

15  admitted perjurer Steve Wood?

16       You know, ladies and gentlemen, I think about this case, and

17  what Steve Wood made, M-Drol and H-Drol, and unfortunately Sitesh

18  Patel was involved for a while, but after April he got out of it.

19  And the Government is asking you to believe Steve Wood's version

20  that they continued to talk on the phone.

21       We talked to him about this Noopept that he still is selling

22  on the market.  I looked at this, and I see that he's still

23  selling these kind of pills.  Who here believes Steve Wood?  Who

24  here would take one of these?  I don't think anybody would.  And

25  I don't think anybody should.  And you know he's not telling the

1    truth, and you know that you can't trust him.

2         So, ladies and gentlemen, the evidence in this case is

3    corroborated by what Sitesh Patel has said, and the physical

4    evidence that pushes the ball way past the 50-yard line.

5         If you don't think that's significant, then I want you to

6    think about who I do believe.  Do I believe Willy Ramos?  Do I

7    believe Steve Wood?  I don't think you can believe either one of

8    them.

9         And so ladies and gentlemen, we're asking you to find that

10   Sitesh Patel withdrew from this conspiracy before that day in

11   July of 2016.  We're asking you to find him not guilty.  This

12   isn't about blamelessness.  You heard him, he's ashamed of

13   himself for ever hanging out with these people.  But this is

14   about following the law.  Before I ever opened my mouth

15   Mr. Kowalczuk got up and asked you a bunch of questions, and

16   you've seen, he put it up on the screen, he asked you a bunch of

17   questions, can you follow the law even if you don't necessarily

18   like the law?  Do you all promise that you would follow the law?

19   And I believe that you all did.  And the law is that Sitesh Patel

20   withdrew from that conspiracy, which he did, in April of 2011,

21   you must find him not guilty of counts one through five.  And we

22   ask you to return a verdict of not guilty.  Thank you, very much

23   for your time and attention.

24            THE COURT:  All right.  Thank you, Mr. Hall.

25   Mr. Ramseyer?

1          MR. RAMSEYER:  The court reporter has reminded me I

2     need to speak slowly but not take a long time.  Hopefully, I'll

3     not speak in quick words.  We have a system of rules, and we have

4     a system of laws to insure that an innocent man is not convicted.

5     Sitesh Patel is not an innocent man.  The evidence shows he was

6     in the conspiracy.  He admitted he was in the conspiracy.

7          Before the trial he gets to see all the Government's

8     evidence.  He sees there's e-mails from January and February that

9     the Government got, December of 2010 to January of 2011 that show

10    him dealing with Steve Wood and H-Drol and M-Drol.  So, he knows

11    he can't come here and say, "I wasn't involved in the conspiracy"

12    because that's not going to fly.  We've got the e-mails that we

13    got off Steve Wood's computer.

14         Then he looks at the other documents, and he sees there's a

15    handwritten note from Sherrie Lester that matches up with an

16    April check saying cash to Sitesh.  So, he can't say I got out

17    before April because there's a written document that says cash to

18    Sitesh.

19         So, what does he do?  He says, "That's when I got out."

20    Why?  Because there's no more documents.  If there had been a

21    document that said June 1 he got cash, he would have said, "I got

22    out then."  But the whole thing is a red herring.  Here's why

23    it's a red herring.  From the very beginning -- look at the

24    e-mails -- from the very beginning what Sitesh Patel's role in

25    the conspiracy was to hook those two guys together, that was it.

1   It didn't matter if he got paid a penny.  He was still in the

2   conspiracy.

3       It's like if you, somebody comes to you and says, "Hey, I'd

4   like to find somebody to help rob a bank with me."  You say, "I

5   know a guy that does bank robberies.  I'll get you two together

6   and you guys can rob a bank."  So, you do that.  And then those

7   people go rob banks, and they rob a bank the next month, and the

8   month after that.  You're part of that conspiracy.  You made it

9   happen.  You got together.

10      All of this stuff is a red herring about whether they got

11  checks, or not.  He didn't have to get paid a thing.  It didn't

12  matter.  He didn't have to -- what's interesting about the case,

13  because he did so much more than he needed to, somehow it looks

14  like when he stops doing that, somehow he's out of the

15  conspiracy.  He's not.

16          MR. HALL:  Your Honor, with respect, I would make an

17  objection to this argument.

18          THE COURT:  I'll overrule the objection.

19          MR. RAMSEYER:  The whole purpose of the law, and the

20  FDA laws are to keep people safe, to keep people from getting

21  hurt.  He admitted people got hurt.  You saw his reaction to

22  that.  I did not mention the products.  But he set it in motion.

23  He's the one that made it happen between those two.  There are

24  consequences to actions.  Hold Sitesh Patel responsible for his

25  actions and find him guilty.

1      If you'll notice, everything that Willy Ramos said and Steve

2  Wood says he agrees with except how much he got paid.  And that

3  when they say he didn't get out, they're wrong; he got out.

4  Because he has to agree to all the other stuff.  It's written,

5  it's documented.  But then they say, "Look, believe Willy Ramos

6  when he says at some point Sitesh said, 'Hey I don't want to be

7  in the middle of this anymore.'"  They say believe that, but

8  don't believe Willy I when he says, "But yeah, in August, August

9  Sitesh had to intervene between me and Steve to get it going

10  again."  Why would Willy lie about that?  It doesn't make any

11  sense.

12      And he said, he says that Willy and Steve lied about him

13  being involved until August because of the statute of limitations

14  issue.  They first said that in 2013.  There's no statute of

15  limitations issue in 2013 when they tell law enforcement about

16  that in August.  August doesn't mean anything to them at that

17  point.  There's no point for them to make that up.

18      And they say, you know, the burden is on them to show

19  withdrawal.  If you can't decide, he's guilty.  He admits to

20  everything else.  And he's saying everybody lied, is what he's

21  saying.  Now, he's saying Steve Wood and Willy Ramos, you know,

22  they're terrible people, they're liars.  Again, he picked them.

23  And they admitted to what they did; they admitted to their

24  conduct.  They're facing the consequences for what they did.

25      The amazing thing is he wants you to believe him over

1    Sherrie Lester.  Sherrie Lester came in here, nice person, she's

2    not nothing in this.  She got in a bad situation.  Remember what

3    Sherrie Lester told you?  She said she sent cash to him, Steve

4    Wood told her to, in that Focus bottle.  You remember I put that

5    Focus thing in front of Sitesh Patel and he said, "Yeah, that's

6    what it came in."  He led me to believe it was 500, $500 or

7    $1,000.  Sherrie Lester told you it was thousands of dollars.

8    Think about it.  If you've got something that big, are you going

9    to put $500 or $1,000 in there?  Think about what he said.  Steve

10   Wood has got cash out of the wazoo.  He's got $259,000 in cash in

11   his car when he's arrested.  Sitesh Patel just hooked him up with

12   another manufacturer of a his biggest product.  Do you think he's

13   going to send him $500 or $1,000 in cash?  No, he's going to

14   reward that guy.  So, don't believe him over Sherrie Lester.

15       The way the criminal system works is somebody gets charged,

16   they get a trial.  That's the way our system works.  He got his

17   trial.  And we did our job; we proved the case.  And everybody in

18   the courtroom has got a job, and everybody has done their job.

19   Defense attorney has done his job.  He's done a great job.  He's

20   taken this case that looks impossible, and he's trying to come up

21   with something.  And the only people left that haven't done their

22   job is you all.  Now, it's up to you.  You're going to get to go

23   back to that jury room and decide if Mr. Patel got away with

24   anything, or not.

25       Everybody has probably seen some newspaper articles, seen

1   something on TV, how did they do that?  What were they thinking

2   of?  You are the jury now.  You're the ones that get to see

3   justice is done.

4        Use your reason and common sense.  Mr. Patel set this all in

5   motion.  It happened just like it was supposed to.  Remember, he

6   told you H-Drol and M-Drol, that's why it got set up, "I wanted

7   them to just keep doing it.  I was fine with it if they kept

8   doing it.  I didn't do anything to stop it."  He's in the

9   conspiracy until it ends September 14th of 2011.

10       Ladies and gentlemen, I want to thank you again for your

11  time, for your valuable service.  It's a very important case.  I

12  appreciate your time.  There's all these documents, all these

13  things here, you can look at all of it, and please do if you need

14  to.  The case comes down to do you believe him, "I did everything

15  the Government says, just the one thing, it's my word against

16  theirs, I got out in April."  He, you've got to believe him more

17  than Willy Ramos, and Sherrie Lester, and all of them.  We don't

18  believe you will.

19       Ladies and gentlemen, I, I thank you for your time.  The

20  last thing I leave you with is Sitesh Patel, he took the oath of

21  a pharmacist.  Remember, Steve Wood is not a pharmacist, Willy

22  Ramos is not a pharmacist, Sherrie Lester is not a pharmacist,

23  they're all just trying to make money.  He's got some duty to do

24  right and make sure people don't get hurt.  Remember, he said, "I

25  don't have a big problem with what they were doing because it was

1   going to South America."  He didn't care if people in South

2   America got hurt.  Their lives are somehow not of as much value.

3   He took a oath to consider the welfare of human beings, and that

4   was his primary concern.  It's not.  Money was his primary

5   concern.  He wanted to keep Steve Wood, his big customer, happy.

6   And he did.

7       Again, thank you for your time.  We ask you find Mr. Patel

8   guilty of all counts.

9       THE COURT:  Thank you, Mr. Ramseyer.  Ladies and

10  gentlemen, I'm going to instruct you as to the law that you are

11  to follow, but first we're going, we've been here a while, and I

12  want you to be able to concentrate on what I'm telling you so

13  we're going to take a short recess, and you can use the

14  facilities.  And when we come back I'll instruct you on the law.

15  So, Mr. Bailiff, if you'll take the jury out.

16      (The jury retired to the jury room, after which the

17  following occurred:)

18      THE COURT:  All right.  Counsel, we'll be in short

19  recess.

20      (Recess from 11:05 a.m. to 11:21 a.m.)

21      THE COURT:  Counsel, before we have the jury back in,

22  the two alternates in the case are Andrew Fairhurst and Laurie

23  Leal, and so before the jury begins deliberation I will remove

24  those alternates.  They will remain in the courthouse in case

25  it's necessary for them to replace a regular juror.  So, we'll

1    have the jury in, please.

2            (The jury entered the courtroom and was seated in the jury

3    box.)

4            THE COURT:  If you'll bear with me just a minute,

5    ladies and gentlemen, I'm going to read you the instructions now.

6    I just want to make sure I have got them all in order.

7            Ladies and gentlemen of the jury, I'm going to give you

8    final instructions now since you will soon leave the courtroom to

9    begin your deliberations.  I'll also send a written copy of these

10   instructions with you to the jury room.

11           As I told you earlier, the Government has accused the

12   defendant of committing certain crimes.  These are only a charge.

13   In order for you to find the defendant guilty of a crime, you

14   must be convinced beyond a reasonable doubt that the defendant

15   committed the crime as charged.  If you are not convinced beyond

16   a reasonable doubt that the defendant committed the crime as

17   charged, you must find him not guilty of that crime.

18           During the trial you received all of the evidence you may

19   properly consider to decide the case.  Your decision in the case

20   must be made solely on the evidence presented at the trial.  You

21   should consider all the evidence that was presented to you.  Do

22   not allow sympathy or prejudice to influence you.  The law

23   demands of you a just verdict, unaffected by anything except the

24   evidence, your common sense, and the law as I give it to you.

25           At times during the trial you saw lawyers make objections to

1    questions or to answers by witnesses.  This simply means that the

2    lawyers were requesting that I make a decision on a particular

3    rule of law.  Do not draw any conclusion from such objections or

4    from my rulings on the objections.  These are only related to the

5    legal questions I had to determine, and should not influence your

6    thinking.  When I sustained an objection to a question the

7    witness was not allowed to answer it.  Do not attempt to guess

8    what answer might have been given had I allowed the question to

9    be answered.  Similarly, when I told you not to consider a

10   particular statement, you were told to put that statement out of

11   your mind, and you may not refer to that statement in your

12   deliberations.

13        Neither in these instructions, nor in any ruling, action or

14   remark that I have made during the course of this trial have I

15   intended to give any opinion or suggestion as to what your

16   verdict should be.

17        During this trial I have occasionally asked questions of

18   witnesses in order to bring out facts not then fully covered in

19   testimony.  Do not assume that I hold any opinion on the matter

20   to which my questions are related.

21        It is my job to decide what rules of law apply to this case.

22   I've explained some of these rules to you during the course of

23   the trial, and I will explain others of them before you go to the

24   jury room.  While the lawyers may have properly commented during

25   the trial on some of these rules, you are to be guided only by

what I say about them.  You must follow all the rules as I give

them to you.  You may not follow some and ignore others.  Even if

you disagree or don't understand the reasons for some of the

rules, you are bound to follow them.

     If you decide the Government has proved beyond a reasonable

doubt that the defendant is guilty, it will also be my job to

decide what the punishment will be.  You should not try to guess

what the punishment might be.  It should not enter into your

consideration or discussions at any time.

     The decision you reach in the jury room, whether guilty or

not guilty, must be unanimous.  You must all agree.  Your

deliberations will be secret.  You will never have to explain

your verdict to anyone.

     The law presumes a defendant to be innocent of a crime.

Thus, the defendant, although accused, begins the trial with a

clean slate.  That is to say, with no evidence against him.  And

the law permits nothing but legal evidence presented before the

jury to be considered in support of any charge against him.  So,

the presumption of innocence, alone, is sufficient to acquit the

defendant unless the jurors are satisfied beyond a reasonable

doubt of the defendant's guilt from all the evidence in the case.

This presumption of innocence is an abiding presumption that goes

with the defendant throughout the entire case, and applies at

every stage.

     As I have said, the Government has the burden of proving the

1    defendant's guilt beyond a reasonable doubt.  An important part

2    of your job will be making judgments about the testimony of the

3    witnesses who testified in this case.  You should decide whether

4    you believe what each person had to say, and how important that

5    testimony was.

6         In making that decision I suggest you ask yourselves a few

7    questions.  Did the person impress you as honest?  Did he or she

8    have any particular reason not to tell the truth?  Did he or she

9    have a personal interest in the outcome of the case?  Did the

10   witness seem to have a good memory?  Did the witness have the

11   ability and opportunity to observe accurately the things he or

12   she testified about?  Did he or she appear to understand the

13   questions clearly and answer them directly?  Did the witness's

14   testimony differ from the testimony of other witnesses?  These

15   are a few of the considerations that will help you determine the

16   accuracy of what each witness said.

17        The weight of the evidence is not necessarily to be

18   determined by the number of witnesses testifying to the existence

19   or non-existence of any fact.  You may find that the testimony of

20   a smaller number of witnesses as to a fact is more persuasive

21   than that of a greater number of witnesses, or you may find that

22   they are not persuasive at all.

23        In determining whether to believe a witness, you may also

24   consider whether a witness said or did something previously that

25   is inconsistent with what the witness said while testifying in

1   the courtroom in this case.

2        There are two types of evidence which are generally

3   presented during a trial:  Direct evidence and circumstantial

4   evidence.  Direct evidence is the testimony of a person who

5   asserts or claims to have actual knowledge of a fact, such as an

6   eye witness.  Circumstantial evidence is proof of a chain of

7   facts and circumstances indicating the existence of a fact.  The

8   law makes no distinction between the weight or value to be given

9   to either direct or circumstantial evidence, nor is a greater

10  degree of certainty required of circumstantial evidence than of

11  direct evidence.

12       While you should consider only the evidence in the case, you

13  are permitted to draw such reasonable inferences from the

14  testimony and exhibits as you feel are justified in the light of

15  common experience.  In other words, you may make deductions and

16  reach conclusions which reason and common sense lead you to draw

17  from the facts which have been established by the evidence in the

18  case.

19       You have heard the testimony of witnesses who have been

20  convicted of a crime.  Prior conviction of a crime that is a

21  felony or involves a dishonest act or false statement is one of

22  the circumstances you may consider in determining the credibility

23  of a witness.

24       You have heard the testimony of witnesses who provided

25  evidence for the Government with the hope of securing leniency in

1    their own cases.  Some people in this position are entirely

2    truthful when testifying.  Still, you should consider the

3    testimony of such individuals with particular caution.  They may

4    have had reasons to make up stories or exaggerate what others did

5    because they wanted to help themselves.

6        Under the law, the Government may request leniency in a case

7    based on the defendant's substantial assistance in the

8    prosecution of another person.  The ultimate sentence imposed,

9    however, is up to the judge, and not to the Government.

10       There has been evidence that other people have pleaded

11   guilty, including some of the Government's witnesses.  The fact

12   that one person has pleaded guilty is not evidence of the guilt

13   of any other person.

14       The Government has charged that certain events or conduct

15   occurred on or about a specific date.  The Government does not

16   have to prove that the events or conduct occurred on the exact

17   dates alleged.  Rather, it is sufficient if they occurred on a

18   date reasonably near the date alleged.

19       During the trial items were received into evidence as

20   exhibits.  Any or all of these exhibits will be sent into the

21   jury room if you request.  Examine the exhibits if you think it

22   would help you in your deliberations.

23       Count one charges that at times between 2008 and August,

24   2011 the defendant knowingly conspired with Steve Wood and Willy

25   Ramos with intent to defraud and mislead to, one, introduce a

1    misbranded drug into interstate commerce in violation of federal

2    law; two, receive a misbranded drug in interstate commerce in

3    violation of federal law; and three, to fail to register with the

4    Food and Drug Administration and provide required information in

5    violation of federal law.

6         Count one further charges the defendant with conspiracy to

7    defraud the United States by impeding the lawful function of the

8    Food and Drug Administration of the Department of Health and

9    Human Services.

10        Count two charges that from 2008 through August, 2011 the

11   defendant conspired with Wood and Ramos to violate federal law by

12   devising a scheme to defraud and obtain money by false

13   representations, and causing delivery, by mail or interstate

14   commercial carrier, of items for the purpose of executing their

15   scheme.

16        The elements of the offenses that are the alleged objects of

17   these charged conspiracies will be described later in detail in

18   my instructions.

19        A conspiracy is an agreement between two or more persons to

20   join together to accomplish some unlawful purpose.  It is a kind

21   of partnership in crime in which each member becomes the agent of

22   every other member.

23        For you to find the defendant guilty of count one or count

24   two, you must be convinced that the Government has proved each of

25   the following beyond a reasonable doubt:

1    One, that at some time during the dates charged there was an

2    agreement between two or more persons to do one or more of the

3    criminal purposes charged;

4    Two, that the defendant voluntarily joined the conspiracy

5    knowing its purpose and intending to help accomplish that

6    purpose;

7    Three, that one or more of the conspirators during the

8    existence of the conspiracy knowingly committed at least one of

9    the overt acts described in the indictment in order to accomplish

10   some object or purpose of the conspiracy.  This element applies

11   only to the conspiracy charged in count one.  As to count two,

12   the Government is not required to prove the commission of an

13   overt act.

14   The word knowingly in these instructions means that the act

15   in question was done voluntarily and intentionally, and not by

16   accident or mistake.

17   The term overt act means some type of outward, objective

18   action performed by one of the parties to or one of the members

19   of the agreement or conspiracy which evidences that agreement.

20   Although you must unanimously agree that the same overt act was

21   committed, the Government is not required to prove more than one

22   of the overt acts charged.  The overt act may, but for the

23   alleged illegal agreement, appear totally innocent and legal.

24   One more thing about overt acts.  This is a limit on how

25   much time the Government has to obtain an indictment.  This is

1    called the statute of limitations.  For you to return a guilty

2    verdict on a conspiracy charge, the Government must convince you

3    beyond a reasonable doubt that at least one overt act was

4    committed for the purpose of advancing or helping the conspiracy

5    after July 26, 2011.

6        One may become a member of the conspiracy without knowing

7    all the details of the unlawful scheme or the identities of all

8    the other alleged conspirators.  If a defendant understands the

9    unlawful nature of a plan or scheme, and knowingly and

10   intentionally joins in that plan or scheme on one occasion, that

11   is sufficient to convict him of conspiracy even if he had not

12   participated before, and even if he played only a minor part.

13   The Government need not prove that the alleged conspirators

14   entered into any formal agreement, nor that they directly stated

15   between themselves all the details of the scheme.

16       Similarly, the Government need not prove that all of the

17   details of the scheme alleged were actually agreed upon or

18   carried out, nor must it prove that all of the persons alleged to

19   have been members of the conspiracy were such, or that the

20   alleged conspirators actually succeeded in accomplishing their

21   unlawful objectives.  However, mere presence at the scene of an

22   event, even with knowledge that a crime is being committed, or

23   the mere fact that certain persons have associated with each

24   other, does not necessarily establish proof of the existence of a

25   conspiracy.  Also, a person who has no knowledge of a conspiracy,

1    but who happens to act in a way that advances some purpose of a

2    conspiracy, does not thereby become a conspirator.

3        Some of the people who may have been involved in these

4    events are not on trial here.  That does not matter.  There is no

5    requirement that all members of a conspiracy be charged and

6    prosecuted or tried together in one proceeding.

7        In count one the Government charges the defendant with a

8    multi-object conspiracy.  The first alleged object of the

9    conspiracy charged in count one is the introduction of a

10   misbranded drug into interstate commerce in violation of federal

11   law.  A person commits this crime if he introduces into

12   interstate commerce a drug that is misbranded at the time of its

13   introduction or delivery for introduction.

14       The second alleged object of the conspiracy charged in count

15   one is -- excuse me, the second alleged object of the conspiracy

16   charged in count one is the receipt of a misbranded drug into

17   interstate commerce in violation of federal law.  A person

18   commits this crime if he receives into interstate commerce a drug

19   that is misbranded at the time of its receipt.

20       Under the law, a drug is defined, among other things, as an

21   article other than food that is intended to affect the structure

22   or any function of the body.  A dietary supplement is considered

23   a food.

24       A drug is misbranded under law if its labeling is false or

25   misleading in any particular; two, in package form its labeling

1   does not contain the name and place of business of the

2   manufacturer, packer or distributor; three, its label does not

3   bear (a) adequate directions for use; and (b) such adequate

4   warnings against use in those pathological conditions or by

5   children where its use may be dangerous to health; or four, it

6   was manufactured, prepared, propagated, compounded or processed

7   in an establishment not duly registered with the Food and Drug

8   Administration, or it was not included in a list of drugs

9   required to be submitted to the Food and Drug Administration.

10      Interstate commerce means (a) commerce between any state or

11  territory and any place outside thereof, and (b) commerce within

12  the District of Columbia or within any other territory not

13  organized with a legislative body.

14      The third alleged object of the conspiracy charged in count

15  one is failure to register with the Food and Drug Administration

16  upon first engaging in the manufacture, preparation, compounding

17  or processing of the drug, and failure to provide a required list

18  of drugs being manufactured and other information to the Food and

19  Drug Administration in violation of federal law.

20      The fourth alleged object of the conspiracy charged in count

21  one is to defraud the United States by impeding, impairing,

22  obstructing and defeating the lawful functions of the Food and

23  Drug Administration in regulating drugs for use by humans.

24      Although you must unanimously agree that the conspiracy

25  charged in count one had at least one of these alleged objects,

1    and you must unanimously agree as to which object the Government

2    has proved, the Government is not required to prove more than one

3    of the objects charged.

4        The Government is not required to prove that the parties to

5    or members of the alleged agreement or conspiracy were successful

6    in achieving any or all of the objects of the agreement or

7    conspiracy.

8        For each of the charged conspiracy counts -- count one and

9    count two -- the Government must show that a single conspiracy

10   existed.  In other words, the Government must show that the

11   single conspiracy alleged in count one existed, and that the

12   single conspiracy alleged in count two existed.  As to each of

13   these counts, proof of separate or independent conspiracies is

14   not sufficient for the Government to meet its burden of proof.

15       In determining whether or not any single conspiracy has been

16   shown by the evidence in the case, you must decide whether

17   common, master or overall goals or objectives existed which

18   served as the focal point for the efforts and actions of any

19   members to the agreement.  In arriving at this decision, you may

20   consider the length of time the alleged conspiracy existed, the

21   mutual dependence or existence between various persons alleged to

22   have been its members and the complexity of the goals or

23   objectives shown.

24       A single conspiracy may involve various people at differing

25   levels and may involve numerous transactions which are conducted

1    over some period of time at various places.  In order to

2    establish a single conspiracy, however, the Government need not

3    prove that an alleged co-conspirator knew each of the other

4    alleged members of the conspiracy, nor need it establish that an

5    alleged conspirator was aware of each of the transactions alleged

6    by the Government.

7        If the evidence in the case shows that the defendant was a

8    member of some conspiracy, but that this conspiracy is not the

9    single conspiracy charged in count one or count two, then the

10   Government has not met its burden of proof as to that count.

11   Unless the Government proves the existence of a single conspiracy

12   described in a count beyond a reasonable doubt, you must acquit

13   the defendant of that charge.

14       The defendant cannot be found guilty of a conspiracy charge

15   if he withdrew from the conspiracy more than five years before

16   the indictment was returned.  The indictment in this case was

17   returned on July 26, 2016.  If you find that the defendant,

18   Mr. Patel, has proved that he withdrew from the conspiracies

19   charged in the indictment prior to July 26, 2011 then you must

20   find him not guilty of counts one and two.

21       In order to withdraw, the defendant must have taken some

22   affirmative act in an attempt to defeat or disavow the goals of

23   the conspiracy such as:  One, completely undermining his earlier

24   acts in support of the commission of the crime so that these acts

25   no longer could support or assist the commission of the crime; or

1    two, performing an affirmative act that is inconsistent with the

2    goals of the conspiracy in a way that the co-conspirators are

3    reasonably likely to know about it before they carry through with

4    the additional acts of the conspiracy; or three, communicating to

5    each of his co-conspirators that he has abandoned the conspiracy

6    and its goals.

7        Merely ceasing active participation in the conspiracy is not

8    sufficient evidence of withdrawal.

9        The defendant has the burden of proving withdrawal from a

10   conspiracy by a preponderance of the evidence.  To prove

11   something by a preponderance of the evidence means to prove that

12   it is more likely than not.  This is a lesser burden of proof

13   than to prove something beyond a reasonable doubt.  Preponderance

14   of the evidence is determined by considering all of the evidence

15   and deciding which evidence is more convincing.  You should

16   consider the relevant testimony of all witnesses, regardless of

17   who may have called them, and all the relevant exhibits received

18   in evidence, regardless of who may have produced them.  If the

19   evidence appears to be equally balanced, or if you cannot say

20   upon which side it weighs more heavily, you must find that the

21   defendant has not met his burden of proving withdrawal by a

22   preponderance of the evidence.

23       The fact that the defendant has raised this defense,

24   however, does not relieve the Government of its initial burden of

25   proving beyond a reasonable doubt that there was an unlawful

1   agreement, and that the defendant knowingly and voluntarily

2   joined it.

3        Counts three, four and five charge that on each specific

4   occasion the defendant, having devised a scheme to defraud and

5   obtain money by false representations, caused delivery by mail or

6   private or commercial interstate carrier anything for the purpose

7   of executing their scheme.

8        In order for you to find the defendant guilty of the

9   offense, you must be convinced that the Government has proved

10  each of the following elements beyond a reasonable doubt:  One,

11  that on or about the date charged the defendant knowingly devised

12  a scheme to defraud or obtain money by false representations;

13  two, that the scheme to defraud or the false representations were

14  material, that is, they would reasonably influence a person to

15  part with money; three, that the defendant did so with the intent

16  to defraud; and four, that in advancing or carrying out the

17  scheme to defraud or obtain money by false representations the

18  defendant used the mails or interstate carriers, or caused the

19  mails or interstate carriers to be used.

20       The use of the United States mails or interstate carriers is

21  an essential element of the offense of mail fraud as charged in

22  counts three, four and five.  The Government is not required to

23  prove that the defendant actually mailed anything or that the

24  defendant even intended that the mails would be used to further

25  or carry out the scheme to defraud or obtain money by false

1   representations.  The Government must prove beyond a reasonable

2   doubt, however, that the mails were, in fact, used in some manner

3   to further or carry out the scheme to defraud or obtain money by

4   false representations.  The Government must also prove that the

5   use of the mails would follow in the ordinary course of business

6   or events, or that the use of the mails by someone was reasonably

7   foreseeable.

8       It is not necessary for the Government to prove that the

9   item, itself, mailed was false or fraudulent, or contained any

10  false or fraudulent representation, or contained any request for

11  money.  The Government must prove beyond a reasonable doubt,

12  however, that the use of the mails or interstate carrier

13  furthered or carried out in some way the scheme to defraud or

14  obtain money by means of false representations.

15      A scheme to defraud or a scheme for obtaining money means

16  any deliberate plan of action or course of conduct by which

17  someone intends to deceive or to cheat another or by which

18  someone intends to deprive another of something of value.

19      The term false representation means a statement or an

20  assertion which concerns a material or important fact or a

21  material or important aspect of the matter in question, and that

22  was either known to be untrue at the time that it was made or

23  used, or that it was made or used with reckless indifference as

24  to whether it was, in fact, true or false, or made or used with

25  the intent to defraud.  A material fact is a fact that would be

1   of importance to a reasonable person in making a decision about a

2   particular matter or transaction.

3        The term false representation includes actual, direct false

4   statements as well as half truths, and includes the knowing

5   concealment of facts that are material or important to the matter

6   in question and that were made or used with the intent to

7   defraud.

8        To act with the intent to defraud means to act knowingly and

9   with the intention or the purpose to deceive or to cheat.  An

10  intent to defraud is ordinarily accompanied by a desire or

11  purpose to bring about some gain or benefit to oneself or some

12  other person by a desire or a purpose to cause some loss to some

13  person.

14       The law permits a conspirator to be convicted of substantive

15  offenses committed by co-conspirators in the course of and in

16  furtherance of the conspiracy.  However, in order for you to find

17  the defendant guilty on this basis, the Government must prove

18  three elements beyond a reasonable doubt:  One, that a criminal

19  offense was committed by one of the members of the conspiracy;

20  two, that the offense was committed while the co-conspirator was

21  a member of the conspiracy; and three, that the offense was

22  committed in furtherance of the conspiracy.

23       You may find the defendant guilty of a criminal offense

24  committed by a co-conspirator if and only if each of these three

25  elements is proven beyond a reasonable doubt.

1    If, after considering all the evidence, you believe the

2 defendant has proved that he had withdrawn from the conspiracy

3 before his co-conspirators committed the charged mail fraud

4 offenses as contained in counts three, four and five, you cannot

5 find the defendant guilty on the basis described in this

6 instruction.

7    A defendant can be guilty of a crime as a principal or as an

8 aider and abettor.  A principal is the person who commits the

9 crime, and an aider and abettor is a person who knowingly aids

10 counsels, commands, induces or procures the commission of a

11 crime.  An aider and abettor is just as criminally responsible as

12 the principal.

13    Before a defendant may be held responsible for aiding and

14 abetting others in the commission of a crime, it is necessary

15 that the Government prove beyond a reasonable doubt that the

16 defendant knowingly and deliberately associated himself in some

17 way with the crime charged, and participated in it with the

18 intent to commit the crime.

19    In order to be found guilty of aiding and abetting the

20 commission of the crime charged, the Government must prove beyond

21 a reasonable doubt that the defendant, one, knew that the crime

22 charged was to be committed or was being committed; two,

23 knowingly did some act for the purpose of aiding, commanding, or

24 encouraging the commission of that crime; and three, acted with

25 the intention of causing the crime charged to be committed.

1    Before the defendant may be found guilty as an aider or an

2    abettor to a crime the Government must also prove beyond a

3    reasonable doubt that some person or persons committed each of

4    the essential elements of the offense charged as detailed for you

5    in the instructions for that charge.

6    Merely being present at the scene of the crime or merely

7    knowing that a crime is being committed or is about to be

8    committed is not sufficient conduct for the jury to find that a

9    defendant aided and abetted the commission of that crime.

10    The Government must prove that the defendant knowingly and

11    deliberately associated himself with the crime in some way as a

12    participant -- someone who wanted the crime to be committed --

13    not as a mere spectator.

14    It is your duty as jurors to talk with one another and

15    deliberate in the jury room.  You should try to reach an

16    agreement if you can.  Each of you must decide the case for

17    yourself, but only after consideration of the evidence with the

18    other members of the jury.  While this is going on, do not

19    hesitate to reexamine your own opinions and change your mind if

20    you are convinced that you were wrong.  But do not give up your

21    honest beliefs solely because the others think differently, or

22    merely to get the case over with.  In a very real way you are

23    judges, judges of the facts.  Your only interest is to determine

24    whether the Government has proved the defendant guilty beyond a

25    reasonable doubt.

1    When you go to the jury room to begin considering the
2    evidence in this case, you should first select one of the members
3    of the jury to act as your foreperson.  This person will help to
4    guide your discussions in the jury room.  Once you are there, if
5    you need to communicate with me the foreperson will send a
6    written message to me.  However, don't ever tell me how you stand
7    as to your verdict numerically or otherwise.  As I have mentioned
8    several times, the decision you reach must be unanimous.  You
9    must all agree.

10    I remind you that during your deliberations you must not
11    talk with anyone or communicate with or provide information to
12    anyone by any means about this case, including by phone, text
13    message or e-mail.  Also, you must not obtain any outside
14    information about this case during your deliberations.

15    I will give you a verdict form to take with you to the jury
16    room.  When you have reached a decision and the verdict form is
17    completed you should have the foreperson sign the verdict form at
18    the end, and tell the court security officer that you are ready
19    to return to the courtroom.

20    And ladies and gentlemen, here is a copy of the verdict form
21    that I'm going to send with you.  And as you can see, it lists
22    each of the counts charged against the defendant, and has a short
23    description of that charge, and a place to mark not guilty or
24    guilty.  And again -- and a place at the end for the foreperson
25    to sign.

 1    And again, when you have reached a unanimous verdict the

 2   foreperson will fill out the verdict form and sign it, and

 3   indicate that you are ready to return to the courtroom with a

 4   verdict.

 5    I'm also going to send with you copies for each of you of

 6   the instructions that I've just read so that each of you will

 7   have a copy of those instructions.  I'll send one of the verdict

 8   form, the verdict form, itself.  I'm also going to send with you

 9   a copy of the indictment in this case; that is, the written

10   charges made by the Government.  Again, the indictment is not

11   evidence of anything; it's simply the charges.  And that way

12   you'll know, again, what the charges are.

13    Now, ladies and gentlemen, two of your members are

14   alternates in the case.  It's necessary to have alternates in

15   case we lose a member of the jury during the trial.  It's no

16   reflection on those persons.  They were chosen ahead of time.

17   But what I'm going to ask you to do is go to the jury room, but

18   don't begin deliberations until the alternates have been removed.

19   I'm going to have them come back into the courtroom and explain

20   to them their, any further duties that they have.  And so once

21   the alternates have left, you may begin your deliberations.  And

22   again, you'll receive these documents that I've discussed with

23   you.

24    So, ladies and gentlemen, finally, it's noon, I assume that

25   you would like to have lunch, go out to lunch before you begin

1    your deliberations.  I see some heads nodding.  And so what I'm

2    going to let you do is, is go to lunch.  I want you to wait in

3    the jury room so that the alternates can be removed, but once

4    that's happened then you can go to lunch.  And if you could take

5    about 45 minutes for lunch, and then return to the courthouse,

6    return to the jury room.  Do not begin your deliberations until

7    all 12 of you are together because you can't have any

8    deliberations unless all of you are together.

9         Do not discuss this case with anyone, or permit anyone to

10   discuss it with you while you're out to lunch.  Of course, and

11   don't discuss it with each other until all of you are back in the

12   jury room.  Don't talk to the alternates about the case unless

13   and until they have to replace a regular member of the jury.  And

14   don't do any, of course, research on your own about any of the

15   issues in this case.

16        So, to summarize, you'll go to the jury room now, I'll

17   remove the alternates, and then you may go to lunch.  When you

18   come back you are not going to come back to the courtroom; you're

19   going to come back to the jury room.  And you can begin your

20   deliberations.  If you want to see any or all of the exhibits,

21   tell the court security officer and those will be delivered to

22   you.

23        All right.  Thank you, very much, ladies and gentlemen.  If

24   you'll take your notebooks and go to the jury room.

25        (The jury retired to the jury room, after which the

 1   following occurred:)

 2           THE COURT:  Counsel, are there any objections to the

 3   court's charge to the jury not previously made?  Mr. Ramseyer?

 4           MR. RAMSEYER:  Not from the Government, Your Honor.

 5           MR. HALL:  Not from the defense, Your Honor.  With one

 6   exception, I did notice in the reading, I didn't catch this

 7   before, there were a couple of "hers" in those final copies.  If

 8   they hadn't been already copied, perhaps they should be.

 9           THE COURT:  The jury understands Mr. Patel is not a

10   her, and I think there will be no confusion.

11       Now, I'm going to ask the bailiff to ask the alternates to

12   step into the courtroom.  And the alternates are Mr. Fairhurst

13   and Ms. Leal, Laurie Leal, L-E-A-L, Fairhurst and Leal.  If

14   you'll ask them to step into the courtroom, please.

15       Counsel, I also had, as my law clerk reminded me, 12 copies

16   of the redacted indictment.

17       Mr. Fairhurst and Ms. Leal, you are both alternates in the

18   case.  No reflection on you at all.  Again, you were chosen ahead

19   of time.  Your duties are not over, however, because it still may

20   be necessary for you to replace a regular member of the jury.

21   So, I'm going to allow you to go to lunch also.  Don't talk to

22   the other members of the jury about anything, and if you'll come

23   back in about 45 minutes, and the court security officer is going

24   to put you in a different room, and so, and we'll keep you

25   advised of how things are going.  But don't discuss the case with

```
1    each other because only until, and unless, you replace a regular
2    member of the jury can you discuss the case.
3         And again, don't discuss the case with anyone else, and
4    follow all the other instructions that I gave you.  Again, thank
5    you, very much.  And you may follow the court security officers
6    out, and then when you come back you'll be placed in a separate
7    room.  All right.  Thank you, very much.
8         (The alternates retired to the jury room, after which the
9    following occurred:)
10        THE COURT:  All right.  Counsel, the, my law clerk is
11   going to deliver the, those documents to the jury room so that
12   they will be present when they return from lunch.
13        Are there any further matters that we need to take up before
14   we take a recess awaiting return of the verdict?
15        MR. HALL:  No, Your Honor.  Would it be possible -- I
16   looked at your rules -- would it be possible for us to hang out
17   at the Martha Washington next door -- that's where we've been
18   staying -- awaiting deliberations?  We would be within five
19   minutes --
20        THE COURT:  I take it you'll probably be in the bar?
21        MR. HALL:  I wish.  I haven't been there all week.
22        THE COURT:  So, does the clerk have your cell phone
23   numbers?
24        MR. HALL:  I will make sure she does.
25        THE COURT:  If you'll provide the clerk with your cell
```

1   phone numbers, just so we can let you know, because again, there

2   may be some early questions or something like that.

3            MR. HALL:  Thank you, very much.

4            THE COURT:  We do, Mr. Ramseyer, we do have a

5   sentencing, Mr. Ramos.  And are you ready to take that up now?

6            MR. RAMSEYER:  Yes, Your Honor.

7            THE COURT:  And I take it that he is here?

8            MR. RAMSEYER:  I think his defense counsel, I saw him

9   out in the hall, Your Honor.

10           THE COURT:  We'll take a short recess and then take up

11  that sentencing.  All right.  We'll be in recess.

12       (Recess from 12:05 p.m. to 2:25 p.m.)

13           THE COURT:  I'm advised that the jury has reached a

14  verdict.  And if you'll have the jury in, please.

15       (Proceedings were had and reported, but not transcribed.)

16       (Proceedings concluded at 2:32 p.m.)

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                           CERTIFICATE

 4

 5          I certify the foregoing is an accurate transcript

 6  from the record of proceedings in the above-entitled

 7  matter.

 8

 9

10  8/14/17                     /s/ Bridget A. Dickert
    Date                        U.S. Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```